Filed 2/14/22

CERTIFIED <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| LEAGUE TO SAVE LAKE TAHOE MOUNTAIN AREA PRESERVATION FOUNDATION et al., | C087102 |
| Plaintiffs and Appellants, | (Super. Ct. No. SCV0038666) |
| v. | |
| COUNTY OF PLACER et al., | |
| Defendants and Respondents; | |
| SIERRA PACIFIC INDUSTRIES et al., | |
| Real Parties in Interest and Respondents. | |
| CALIFORNIA CLEAN ENERGY COMMITTEE, | C087117 |
| Plaintiff and Appellant, | (Super. Ct. No. SCV38578) |
| v. | |
| COUNTY OF PLACER, | |
| Defendant and Respondent; | |
| SIERRA PACIFIC INDUSTRIES et al., | |
| Real Parties in Interest and Respondents. | |

APPEAL from a judgment of the Superior Court of Placer County, Michael W. Jones, Judge. Affirmed as modified.

Shute, Mihaly & Weinberger, Amy J. Bricker, Rachel B. Hooper, Laura D. Beaton; and Daniel P. Selmi for Plaintiffs and Appellants League to Save Lake Tahoe, Mountain Area Preservation Foundation, and Sierra Watch.

Law Office of Eugene Wilson and Eugene S. Wilson for Plaintiff and Appellant California Clean Energy Committee.

Clayton T. Cook, County Counsel for Defendants and Respondents County of Placer and Placer County Board of Supervisors.

Remy Moose Manley, Whitman F. Manley, Howard F. Wilkins III, and Nathan O. George for Real Parties in Interest and Respondents Mountainside Partners, LLC, et al.

These appeals concern Placer County's approval of a land use specific plan and rezoning to permit residential and commercial development and preserve forest land near Truckee and Lake Tahoe. The plaintiffs and appellants contend the County's environmental review of the project did not comply with the California Environmental Quality Act (Pub. Resources, § 21000 et seq. (CEQA)) on numerous grounds, and the rezoning did not comply with the California Timberland Productivity Act of 1982 (Gov. Code, § 51100 et seq.). (Statutory section citations that follow are to the Public Resources Code unless otherwise stated.) The trial court rejected each of plaintiffs' claims except one, a conclusion which the County and real parties in interest contest in their cross-appeal.

In C087102, the appellants contend:

(1) The environmental impact report (EIR) violated CEQA by not adequately describing the Lake Tahoe Basin's existing air and water quality, and, due to that failure and the County's decision not to utilize a vehicle-miles-traveled threshold of significance such as one adopted by the Tahoe Regional Planning Agency (TRPA), the EIR violated

CEQA by not adequately analyzing the impacts that project-generated traffic may have on the Basin's air quality and Lake Tahoe's water quality;

(2) The County violated CEQA by not recirculating the final EIR after it revised the draft EIR to include a new analysis of the project's impacts on climate and by mitigating the impact with an invalid mitigation measure; and

(3) The County violated the Timberland Productivity Act by not making certain findings before immediately rezoning the developable portion of the site.

In their cross-appeal, the County and real parties in interest claim the trial court erred when it found that the EIR did not adequately address the project's impacts on emergency evacuation plans and that substantial evidence did not support the EIR's conclusion that the impact would be less than significant.

In C087117, the appellant challenges the EIR's greenhouse gas emission mitigation measure. It also contends the EIR violated CEQA by:

(1) Not adequately describing the environmental setting of forest resources or analyzing the project's cumulative impacts on forest resources;

(2) Not addressing feasible measures to mitigate the project's impact on traffic;

(3) Not disclosing the significant impacts that will occur due to the project's contribution to widening state route 267; and

(4) Not discussing whether the project could increase its reliance on renewable energy sources to meet its energy demand.

We affirm both judgments in part.

In C087102, we affirm the judgment except to hold that the analysis of the project's impact on Lake Tahoe's water quality and greenhouse gas emission mitigation measure 12-2 do not comply with CEQA, and the EIR's analysis of the project's impact on evacuation plans is supported by substantial evidence.

In C087117, we affirm the judgment except to hold that greenhouse gas emission mitigation measure 12-2 does not comply with CEQA, substantial evidence does not

3

support the County's finding that no additional feasible mitigation measures existed to mitigate the project's traffic impacts on state route 267, and the EIR's discussion of the project's energy impacts does not comply with CEQA.

FACTS AND HISTORY OF THE PROCEEDINGS

Real party in interest Sierra Pacific Industries (SPI) owns two large parcels of land in Martis Valley, an unincorporated area of Placer County between Truckee and Lake Tahoe. The parcels sit on opposite sides of state route 267, a highway that connects Truckee to Kings Beach on Lake Tahoe's north shore. The parcel generally west of route 267, known as the West Parcel, has 1,052 acres. It is southeast of the Northstar California resort. The East Parcel on the opposite side of route 267 has 6,376 acres. Both parcels are undeveloped coniferous forest. Both parcels border, and in small instances cross into, the Lake Tahoe Basin to their south.

The Martis Valley Community Plan designates the West Parcel as Forest. The parcel is zoned as Timberland Production Zone (TPZ). A TPZ, authorized by the Timberland Productivity Act, is a land use zoning that restricts the land's permitted uses to growing and harvesting timber and other compatible uses. In return, the County assesses the TPZ land for taxation purposes based on the land's restricted uses.

The Community Plan designates most of the East Parcel as Forest, and that portion of the property is also zoned TPZ. However, approximately 670 acres of the East Parcel are zoned for development of up to 1,360 dwelling units and 6.6 acres of commercial uses.

In 2006, appellants and conservation groups Sierra Watch and Mountain Area Preservation Foundation contacted SPI regarding conservation issues in Martis Valley. The East Parcel was identified as a priority for conservation, as preserving that parcel from development would connect an estimated 50,000 acres of open space east of route 267. Applicants and the conservation groups met numerous times from 2009 to 2013 to

4

explore conservation opportunities.  In 2013, they signed an agreement to aid the conservation and development of both parcels.  The agreement was to facilitate transferring the East Parcel's development rights to portions of the West Parcel and preserving all of the East Parcel as permanent open space via purchase of a fee simple interest or conservation easement.

Although cooperation between the parties ended, SPI and its partners, real parties in interest Mountainside Partners LLC, and MVWP Development, LLC (collectively the applicants) applied to the County in 2013 for a specific plan they believed was consistent with the primary terms of the agreement.  The proposed specific plan, the Martis Valley West Parcel Specific Plan, would amend the Martis Valley Community Plan and related zoning to (1) allow development of up to 760 residential units and 6.6 acres of commercial use on a 775-acre portion of the West Parcel and withdraw those lands from the TPZ zone; and (2) designate all of the East Parcel, including the 670 acres zoned for development under the existing community plan, as Forest and TPZ.  Upon approval of the specific plan, applicants would sell the East Parcel for conservation purposes or place the land in a conservation easement in perpetuity.

The specific plan and its related zoning and other legislative approvals, and not any approvals of actual development, comprise the CEQA project before us.  The immediate rezoning out of TPZ was also subject to the requirements and procedures of the Timberland Productivity Act.  (Gov. Code, § 51133.)  The County issued a notice of preparation that it and TRPA would prepare a joint EIR/environmental impact statement (EIS) under CEQA and the National Environmental Protection Act.  TRPA would participate because small portions of the two parcels lie within the Lake Tahoe Basin, the area of land subject to TRPA's land use regulatory authority.

In response to comments to the notice of preparation, applicants revised the proposed specific plan.  In the revised plan, applicants removed the acreage within the Lake Tahoe Basin and TRPA's jurisdiction from the scope of the project.  Applicants

5

also reduced the land that could be developed on the West Parcel from 775 acres to 662 acres, but they stated they would develop the same number of dwelling units (760) and the same amount of commercial space (6.6 acres) as originally planned. The undeveloped portions of the West Parcel would remain Forest and TPZ. As a result of this change, TRPA would no longer be required to approve the project, and the County proceeded to prepare a program EIR as the sole lead agency.

The County released a draft EIR in October 2015 and a final EIR in May 2016. After two public hearings, the planning commission by a vote of five to two recommended the County deny the proposed specific plan.

After additional public hearings, the board of supervisors on October 11, 2016, certified the EIR and approved the specific plan by a vote of four to one. The approvals also included a statement of findings of fact and overriding considerations, a mitigation monitoring and reporting plan, the proposed rezonings, and a development agreement. The board of supervisors also found that the immediate rezoning of the West Parcel out of the TPZ was consistent with the purposes of the Timberland Productivity Act and was in the public interest.

Plaintiff and appellant League to Save Lake Tahoe, along with the Mountain Area Preservation Foundation and Sierra Watch (the parties refer to these appellants collectively as Sierra Watch) and the California Clean Energy Committee (the Committee) filed separate petitions for writ of mandate and complaints contending the County violated CEQA and the Timberland Productivity Act in approving the project. The trial court consolidated the actions for hearing. It found in favor of the County on all claims except the EIR's analysis of the project's impacts on adopted emergency response and evacuation plans. The court ordered that a writ of mandate issue directing the County to vacate its certification of the EIR and approval of the project as they pertained to emergency evacuations for wildfires and other emergencies. The court also ordered

6

the County to suspend all project approvals and activities that could result in any change or alteration to the physical environment.

Sierra Watch and the Committee appeal, and the County and applicants cross appeal. (For ease of reference, and because the County fully joins in the applicants' briefs, we refer to the County and applicants collectively as the County unless the context requires otherwise.) We consolidated the appeals for purposes of the record, argument, and decision.[1]

SIERRA WATCH'S APPEAL

(C087102)

Sierra Watch contends the County certified the EIR and approved the project in violation of CEQA and the Timberland Productivity Act. It raises the following contentions:

(1) The EIR violated CEQA by not adequately describing the Lake Tahoe Basin's current physical conditions as part of describing the project's regional environmental setting, and that omission and the decision not to utilize a threshold of significance based on vehicle miles travel in the Basin resulted in the EIR not adequately analyzing the impacts increased traffic generated by the project may have on the Basin's air quality and Lake Tahoe's water quality;

(2) The County violated CEQA by not recirculating the final EIR after it revised the draft EIR to include a new analysis of the project's impacts on climate and also by not

---

[1] The County's request for judicial notice is granted in part. Of the request's exhibits, we grant judicial notice of Exhibit A, TRPA's 2012 Regional Plan Update, and Exhibit F, Stats. 1981, ch. 1095, §§ 1-10. Judicial notice is denied for all other exhibits. Each concerns a matter that occurred after the County approved the project and is outside the administrative record. Evidence not contained in the record of an agency's quasi-legislative CEQA proceedings is not admissible with exceptions not applicable here. (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 565, 573-574.)

determining whether the mitigation measures proposed in the draft EIR would mitigate the climate impacts which the new analysis had discovered; and

(3)  The County violated the Timberland Productivity Act by not making certain findings before rezoning the developable portion of the West Parcel from TPZ immediately to zoning that permits the proposed development.

We turn first to the CEQA contentions.

I

*Overview of CEQA*

"CEQA was enacted to (1) inform the government and public about a proposed activity's potential environmental impacts; (2) identify ways to reduce, or avoid, those impacts; (3) require project changes through alternatives or mitigation measures when feasible; and (4) disclose the government's rationale for approving a project.  (*California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2015) 62 Cal.4th 369, 382 [].)  CEQA embodies a central state policy requiring 'state and local governmental entities to perform their duties "so that major consideration is given to preventing environmental damage." ' (*Friends of the Eel River v. North Coast Railroad Authority* (2017) 3 Cal.5th 677, 711, quoting § 21000, subd. (g).)  Accordingly, CEQA prescribes how governmental decisions will be made whenever an agency undertakes, approves, or funds a project.  (*Union of Medical Marijuana Patients, Inc. v. City of San Diego* (2019) 7 Cal.5th 1171, 1185 [].)"  (*Protecting Our Water and Environmental Resources v. County of Stanislaus* (2020) 10 Cal.5th 479, 488.)

If the approving agency determines that the project may have a significant effect on the environment, as the County did here, the agency, referred to as a lead agency, must prepare an EIR before approving the project.  (§§ 21100, subd. (a), 21151, subd. (a); *Tomlinson v. County of Alameda* (2012) 54 Cal.4th 281, 286.)  "The purpose of an EIR is to inform the agency and the public, in detail, about the effect the project is likely to have

8

on the environment and the ways available to minimize that impact. ([] § 21061.)" (*Friends of Sierra Madre v. City of Sierra Madre* (2001) 25 Cal.4th 165, 184-185, fn. omitted.)

The four primary components of an EIR are (1) the project description. This discloses the activity proposed for approval. (Cal. Code Regs., tit. 14, § 15124 (Guidelines).) (2) A description of the project's local and regional environmental setting. This establishes a baseline for determining the significance of potential environmental impacts. (Guidelines, § 15125.) (3) Discussion and analysis of the project's potentially significant impacts to the physical environment, including cumulative impacts when considering the project's impacts in light of other pending or planned projects' impacts. (§ 21100, subd. (b); Guidelines, §§ 15126.2, subd. (a), 15130.) (4) Discussion of feasible mitigation measures and project alternatives that could lessen or avoid the project's significant environmental effects. (§ 21100, subd. (b)(3), (4); Guidelines, §§ 15126.4, subd. (a)(1), 15126.6; see Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (2d ed. CEB) § 11.2.)

If the EIR identifies significant effects which the project will have on the environment, "the lead agency may not approve the project unless it finds that changes have been made in the project to avoid these effects, or, if the mitigation measures or alternatives identified in the EIR are not feasible, there are overriding benefits that outweigh the impact on the environment. ([] § 21081.)" (*Friends of Sierra Madre v. City of Sierra Madre, supra*, 25 Cal.4th at p. 185.)[2]

---

[2]    Regarding the "Guidelines," the Resources Agency promulgated the State CEQA Guidelines for implementing CEQA. The California Supreme Court states, "These Guidelines . . . are 'central to the statutory scheme'; they 'serve to make the CEQA process tractable for those who must administer it, those who must comply with it, and ultimately, those members of the public who must live with its consequences.' (*California Building Industry Assn.* [*v. Bay Area Air Quality Management Dist.,*] *supra*, 62 Cal.4th at pp. 385, 384.) Although we have 'not [yet] decided . . . whether the

9

II

*Lake Tahoe Basin's Air Quality and Water Quality*

Sierra Watch argues that because the project traffic's impacts on the Tahoe Basin's air quality and Lake Tahoe's water quality were potentially significant effects on the environment and on a unique environmental resource, the EIR was obligated to, but did not (1) describe the Tahoe Basin's existing air quality and the lake's water quality as part of its description of the project's regional environmental setting, nor (2) analyze the project's impacts on the Basin's air quality and water quality and determine their significance individually and cumulatively. Sierra Watch also criticizes the County's decision not to utilize a threshold standard of significance established by TRPA for regulating Basin air and water quality as a method for analyzing the existing setting and evaluating the project's impacts on the Basin.

The draft EIR provided an analysis of air quality in the Tahoe-Truckee region generally. It concluded the project's impacts individually were less than significant and, when mitigated, were cumulatively less than significant. The draft EIR did not address Lake Tahoe's water quality. In the final EIR, the County recognized the TRPA threshold had been used by TRPA as an indicator of vehicle emission impacts on Basin air and water quality. It said the project's in-Basin traffic would not cause the threshold to be exceeded, but it did not utilize the threshold to determine whether the potential impact

Guidelines are regulatory mandates or only aids to interpreting CEQA' (*Laurel Heights* [*Improvement Assn. v. Regents of University of California* (1988)] 47 Cal.3d [376,] 391, fn. 2 [(*Laurel Heights I*)], we have nevertheless concluded that the Guidelines are owed deference insofar as they reflect the agency's specialized knowledge and expertise and were adopted through a process of notice and public comment under the California Administrative Procedure Act. (*California Building Industry Assn.*, *supra*, 62 Cal.4th at pp. 381, 389-390.) Thus, we afford the Guidelines 'great weight' unless a provision is 'clearly unauthorized or erroneous under the statute.' (*Id*. at p. 381.)" (*Friends of College of San Mateo Gardens v. San Mateo County Community College Dist.* (2016) 1 Cal.5th 937, 954.)

was significant. It also stated that any impacts to Lake Tahoe's water quality from project-generated traffic were accounted for in a federally-approved water pollution abatement program.

Sierra Watch claims these analyses did not comply with CEQA's substantive and procedural requirements and were not supported by substantial evidence.

## A. Background

Our resolution of this contention requires a detailed explanation of its factual background. To understand Sierra Watch's argument, we first introduce the threshold of significance adopted by TRPA which Sierra Watch claims the County should have utilized or one similar to it. We also describe a multijurisdictional program imposed under the federal Clean Water Act to restore Lake Tahoe's deep-water transparency known as the Lake Tahoe Total Maximum Daily Load (TMDL), the pollution abatement program that the County briefly relied on in the final EIR. We then describe how the County addressed the project's potential impacts on the Tahoe Basin's air quality and water quality in the scoping process, the draft EIR, and the final EIR.

### 1. TRPA thresholds of significance

TRPA is an agency created by the California and Nevada legislatures to coordinate and regulate development in the Lake Tahoe Basin and to conserve its natural resources. (Gov. Code, § 66801, art. I, subds. (a), (b); *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency* (2002) 535 U.S. 302, 309 [152 L.Ed.2d 517].) Its governing Compact directed TRPA to develop environmental quality standards for the Tahoe Basin known as "environmental threshold carrying capacities." (*Id*. at p. 310; Gov. Code, § 66801, art. V, subd. (b).) An environmental threshold carrying capacity is "an environmental standard necessary to maintain a significant scenic, recreational, educational, scientific, or natural value of the region or to maintain public health and safety within the region." (Gov. Code, § 66801, art. II, subd. (i).) TRPA also adopted a

regional plan to implement and maintain the environmental threshold carrying capacities while providing for orderly growth and development.

The TRPA threshold Sierra Watch champions in this action is the Vehicle Miles Traveled (VMT) threshold. The VMT threshold is a modeled measurement of the vehicle miles traveled in the Tahoe Basin by passenger vehicles on peak summer days. It was adopted as a way to meet TRPA's air quality goals and later used also as an indicator of water quality. The VMT threshold calls for reducing in-Basin VMT to 10 percent below 1981 peak levels of VMT. At the time of the project's environmental review, the threshold required VMT in the Basin not to exceed 2,067,600.

Development projects in the Tahoe Basin approved by TRPA must mitigate all traffic and air quality impacts to levels consistent with the environmental threshold carrying capacities, including the VMT threshold. In addition, new projects must offset these impacts by paying air quality mitigation fees based on the number of daily vehicle-trips the projects generate.

### 2. The Lake Tahoe TMDL

Lake Tahoe's famed transparency has significantly declined since monitoring began in the 1960s. Scientists have determined that three pollutants are primarily responsible for the loss of transparency: fine sediment particles, phosphorus, and nitrogen. Runoff from the Basin's urban and forested lands and atmospheric deposition of pollutants directly on the lake's surface are the largest sources of these pollutants. Urban stormwater runoff is the largest source of fine sediment particles, while atmospheric deposition is the largest source of nitrogen in the lake. Motor vehicles contribute to the formation of fine sediment particles by creating sediment and dust, and they and airplanes are the primary sources of atmospheric nitrogen.

The federal Clean Water Act requires states to adopt water quality standards for polluted water bodies and to implement actions to meet those standards. Lake Tahoe has

not met these standards, and as a result, the lake is listed under the Clean Water Act as impaired by the input of fine sediment particles, phosphorus, and nitrogen.

Section 303(d) of the Clean Water Act requires states to establish total maximum daily loads (TMDLs) for impaired waters. A TMDL is a plan approved by the federal Environmental Protection Agency to reduce pollution in impaired water bodies. It identifies numeric targets based upon water quality objectives, and it specifies the maximum amounts of pollutants a water body can receive and still remain in attainment of the water quality objectives. A TMDL also identifies the amount of reductions in pollutants that are needed to attain the water quality objectives, and it sets forth an implementation plan to achieve those reductions.

The Lake Tahoe TMDL was finalized in 2010 by the California Regional Water Quality Control Board, Lahontan Region, and the Nevada Department of Environmental Protection, and it was approved by the federal Environmental Protection Agency in 2011. It established a transparency standard for the lake, and it determined the amounts of existing loads of fine sediment particles, phosphorus, and nitrogen that had to be reduced to attain that standard. It also set forth an implementation plan for agencies to implement to achieve those reductions.

To achieve the transparency standard, the TMDL focused on reducing fine sediment particle loading from runoff through improvements to stormwater controls, as that provided the largest and most cost-efficient opportunity to reduce fine sediment particle and phosphorus loads. The TMDL did not propose actions to reduce atmospheric loads of nitrogen to the lake caused by mobile sources. Instead, the TMDL relied on TRPA's air quality programs and transportation plans to manage the loads of nitrogen from vehicles.

The County is one of the agencies assigned to implement the TMDL within its boundaries and reduce its share of the pollutants in its stormwater runoff.

13

### 3. EIR scoping process

With a basic understanding of TRPA's VMT threshold carrying capacity and the Lake Tahoe TMDL, we can turn to the project's environmental review. As stated earlier, when the applicants first applied for the specific plan, the project included acreage that was within TRPA's jurisdiction. As a result, both the County and TRPA intended to prepare a joint EIR/EIS to evaluate the project. In its notice of preparation of the EIR/EIS, the County and TRPA stated the EIR would evaluate the effects the project may have on TRPA's environmental threshold carrying capacities. The EIR's air quality analysis would assess "the project's cumulative contribution to regional air quality."

Commenting on the notice of preparation, environmental organizations including appellant League to Save Lake Tahoe stated the project would create more traffic and VMT on Tahoe Basin roadways and increase air and water pollution in the Basin. They asked the County to examine these impacts in the EIR/EIS.

After applicants removed the acreage within TRPA's jurisdiction from the project, the project no longer needed TRPA's approval and TRPA was no longer a lead agency on the project's environmental review. The EIR states that because the project was no longer within TRPA's jurisdiction, there was no requirement that the EIR apply or the project satisfy TRPA's environmental threshold carrying capacities.

Due to the change in the project, the County in 2015 revised its notice of preparation of the EIR. The new notice deleted the earlier statement that the EIR would evaluate the project's effects on TRPA's environmental threshold carrying capacities. The notice said nothing about reviewing the project's potential impacts to Lake Tahoe's water quality. The notice, however, continued to state that the EIR would evaluate the project's cumulative contribution to regional air quality.

Commenting on the revised notice of preparation, League to Save Lake Tahoe and another environmental organization stated the project would likely increase the amount of

traffic and VMT in the Tahoe Basin and again asked that those impacts be addressed in the EIR.

### 4. Draft EIR's analysis of Basin air and water quality impacts

The draft EIR did not take up the environmental groups' request. It did not utilize Basin VMT to describe the Tahoe Basin's air quality or Lake Tahoe's water quality as part of setting forth the project's regional setting. The draft EIR did discuss the project's impact on regional air quality, including vehicle emissions caused by the project, but it did not address a potential impact that in-Basin vehicle traffic generated by the project could have specifically on Tahoe Basin's air quality and Lake Tahoe's water quality.

The draft EIR analyzed the project's post-construction (or operational) long-term impacts to air quality in the Truckee-Tahoe area generally. It expressed the existing regional conditions by relying primarily on four years of available air quality measurements taken from monitoring stations in Truckee (for ozone and $PM_{2.5}$) and South Lake Tahoe (for $PM_{10}$).[3] Data from monitoring stations in Kings Beach and Tahoe City for ozone and $PM_{2.5}$ were considered not to be of sufficient quality to determine regulatory compliance.

The draft EIR also described the existing condition by means of emissions inventories, ambient air quality standards set by the state and federal government, and the

---

[3] Ozone is formed through chemical reactions between emissions of reactive organic gases (ROG) and oxides of nitrogen ($NO_x$) in the presence of sunlight. $NO_x$ result from the combustion of fuels. $PM_{10}$ refers to respirable particulate matter with an aerodynamic diameter of 10 micrometers or less. $PM_{10}$ consists of particles emitted directly into the air such as dust, soot and smoke from mobile and stationary sources, construction operations, fires and natural wind-blown dust, and particulate matter formed in the atmosphere by reaction of gaseous precursors. Fine particulate matter ($PM_{2.5}$) is a subgroup of smaller particles that have an aerodynamic diameter of 2.5 micrometers or less.

status of attaining those standards for criteria pollutants[4] in the Placer County portion of the Mountain Counties Air Basin, the regulatory air basin in which the project and, according to the applicants, the Tahoe Basin are located. Ozone, $NO_2$, and PM are in nonattainment or unclassified in the Placer County portion of the Mountain Counties Air Basin. Mobile sources such as vehicles are the largest contributor of nitric acid.

The draft EIR concluded that any impact the project individually would have during its operation on regional air quality, including from vehicle emissions, was less than significant. The project's emissions of ROG, $NO_x$, or $PM_{10}$ would not exceed thresholds of significance adopted by the Placer County Air Pollution Control District for individual projects. The portions of the Mountain Counties Air Basin and the Lake Tahoe Basin that are within Placer County are within the jurisdiction of the Placer County Air Pollution Control District. (Health & Saf. Code, § 40002.)

However, the project's cumulative emissions of ROG and $NO_x$ would exceed the Air Pollution Control District's threshold of significance for cumulative impacts and would be cumulatively significant. To mitigate this impact, the EIR proposed that the County require future developers to take actions and pay mitigation fees to ensure project $NO_x$ emissions did not exceed the threshold. As mitigated, this cumulative impact would be less than significant.

Regarding water quality, the draft EIR focused on potential effects to the Truckee River Basin, as the project site drains northward ultimately to the Truckee River. The draft EIR did not discuss Lake Tahoe's existing water quality or any potential impacts that project-generated traffic may have on the lake's transparency.

---

[4]     Concentrations of ozone, carbon monoxide (CO), nitrogen dioxide ($NO_2$), sulfur dioxide ($SO_2$), $PM_{10}$, $PM_{2.5}$, and lead are the criteria air pollutants.

16

### 5. TRPA's comment on the draft EIR

TRPA commented on the draft EIR. It stated the project, if implemented without mitigation, would significantly affect Lake Tahoe's physical environment through increased vehicle trips into, and the amount of vehicle miles traveled within, the Tahoe Basin. TRPA estimated the project would generate 1,394 daily in-Basin trips and increase Basin VMT by between 16,235 and 21,311. Those trips and the additional VMT would add to the cumulative impacts from other projects under construction in Placer County.

TRPA explained how it would have analyzed these impacts had the project been developed in the Tahoe Basin under its regulatory authority. It stated it used both VMT and the number of vehicle trips as standards for determining the significance of environmental impacts. The project could increase in-basin VMT by 0.2 to 1 percent, contributing along with other projects to exceedance of TRPA's VMT threshold.

The project would also exceed TRPA's vehicle trip standard of significance. Under this standard, a project that would generate more than 200 daily vehicle trips in the Basin is presumed to create a significant impact, and applicants for such in-Basin projects must prepare an analysis of potential traffic and air quality impacts. In addition, TRPA requires all new in-Basin projects, including those that generate less than 200 daily vehicle trips, to offset their impacts by paying an air quality mitigation fee based on the number of vehicle trips the project will generate.

TRPA stated that its staff and County staff had engaged in productive discussions on how to address the project's in-Basin impacts. Their discussions had focused on two measures: traffic impact fees to implement transportation and mass transit capital improvement programs, and the formation of zones of benefit to provide ongoing transit funding. TRPA stated the project's participation in these two funding mechanisms would offset the vehicle trips and the VMT the project would generate in the Basin.

### 6. Final EIR's analysis and response to comments

Responding to comments on the draft EIR, the County in the final EIR addressed TRPA's VMT threshold, and it briefly addressed impacts to Lake Tahoe's water quality. Regarding VMT, the County stated that because the project is not within TRPA's jurisdiction, it did not use TRPA's thresholds as standards of significance in the EIR. Nevertheless, addressing VMT, the final EIR stated TRPA had posited that VMT was an indicator of air quality and water quality. Increased VMT would result in increased traffic congestion, increased nitrate loading into the atmosphere, and subsequent deposition into Lake Tahoe. It would also result in increased airborne concentration of particulate matter.

The project would generate approximately 1,394 daily vehicle trips to and from the Tahoe Basin, generating approximately 13,745 VMT within the Basin on a peak travel day. TRPA had estimated in 2010 that existing Basin VMT was 1,984,600, below the threshold of 2,067,600 VMT. The project's VMT would increase Basin VMT to 1,998,345, or by about 0.7 percent. The additional traffic from the project would not result in Basin VMT exceeding TRPA's VMT threshold. The final EIR did not discuss whether the cumulative impact of the project's VMT along with other current and future development projects' VMT would cause Basin VMT to exceed TRPA's threshold.

The final EIR reviewed six other EIRs/EISs for recent projects within and nearby the Tahoe Basin to determine how those documents had used and interpreted TRPA's VMT threshold. Of the four projects within the Basin, only one had used the VMT threshold as a standard of significance. Two others used TRPA's standard of 200 daily trips to determine the projects' impacts were significant, and the fourth used a standard of 1,150 VMT. Of the two projects outside the Basin, one found its traffic impacts were not significant because its Basin VMT would not exceed the TRPA threshold; the other did not evaluate the significance of its VMT in the Basin. The final EIR stated these

documents did not provide clear guidance in determining whether the project's contribution to Basin VMT would be significant.  The project's 0.7 percent increase in Basin VMT was higher than a 0.03 percent increase from another project whose EIR stated the increase was less than significant, but the project-generated VMT would not cause the TRPA VMT threshold to be exceeded.

Without resolving whether the project's increase in Basin VMT was or would cause a significant impact individually or cumulatively, the final EIR stated that in any event, permanent transit funding required under mitigation measure 10-5 to mitigate the project's impact on area transit services would reduce VMT impacts in the Basin.  This fee paralleled the fee imposed by TRPA ordinances on development projects in the Basin for reducing air emissions from vehicular travel.

The final EIR also briefly addressed the project's potential to impact Lake Tahoe's water quality by referencing the Lake Tahoe TMDL.  A commenter on the draft EIR had expressed concern that project-related traffic would increase air pollution and sediment deposition in Lake Tahoe.  In response, the County repeated that it had determined the project's operation as mitigated would not exceed the Placer County Air Pollution Control District's significance thresholds individually and cumulatively.  The County stated that the majority of vehicle-related pollutants that enter Lake Tahoe are from vehicles within the Tahoe Basin.  Since 65-70 percent of the traffic that the project would generate would not travel into the Basin, the airborne fine sediment produced from that traffic would not reach Lake Tahoe.

As for the 30-35 percent of project-generated vehicle trips that would enter the Basin, the County stated that those trips "would be consistent with the total vehicle miles travelled that were accounted for in the development of the Lake Tahoe Total Maximum Daily Load pollutant load reduction strategy.  As such," the final EIR continued, "all vehicle trips up to the VMT threshold standard have already been accounted for in a science-based regulatory program that provides a comprehensive strategy to achieve Lake

Tahoe water quality standards." The final EIR's list of references included the TMDL's Pollutant Reduction Opportunity Report, dated March 2008, and provided a website where the document could be accessed on the Internet. These statements were the EIR's sole references to, and explanations of, the Lake Tahoe TMDL.

B.    Discussion

Sierra Watch contends the EIR did not sufficiently describe the physical characteristics of the Lake Tahoe Basin's existing air quality and Lake Tahoe's water quality as part of describing the project's regional setting, nor did it adequately analyze the project's impacts to those resources. It criticizes the County for not using TRPA's VMT threshold or the science behind it to describe the Basin's setting and the project's impacts on the Basin.

Specifically, Sierra Watch claims the EIR did not meaningfully describe the Basin's current physical conditions, and in particular, its existing air quality and water quality. Although the EIR discussed the existing air quality in the Mountain Counties Air Basin, that discussion does not include the Lake Tahoe Basin as the latter is not within the Mountain Counties Air Basin. Sierra Watch argues that except for the sole measurement of $PM_{10}$ taken from the monitoring station in South Lake Tahoe, the draft EIR did not discuss the Basin's existing air quality or VMT, and it claims the $PM_{10}$ measurement was inadequate as it lacked contextual information. The draft EIR also did not describe Lake Tahoe's existing transparency and water quality.

Sierra Watch claims that the final EIR did not correct these omissions. The final EIR provided the VMT in the Basin as of 2010, but Sierra Watch contends this isolated figure is outdated and does not meet CEQA's demand for a description of the physical conditions as of the time environmental review begins. Sierra Watch also claims that the final EIR's reliance on the Lake Tahoe TMDL was a red herring because the EIR was

20

still required to describe the existing physical setting and evaluate impacts, the TMDL notwithstanding.

Sierra Watch further claims that the EIR's inadequate discussion of the regional setting led to an inadequate discussion of the project's impacts on the Tahoe Basin. The draft EIR allegedly did not discuss the project's individual or cumulative impacts on the Tahoe Basin's air quality or Lake Tahoe's water quality. It provided no thresholds to assess those impacts and little reference to programs of other agencies, such as TRPA's thresholds of significance, that protect those resources. As a result, the draft EIR did not reach any conclusion about the significance of the project's impacts on the Basin or the Lake and thus did not identify any mitigation for those impacts.

Sierra Watch acknowledges that the final EIR determined that in-Basin traffic generated by the project would not cause the Basin's total VMT to exceed the VMT threshold. However, Sierra Watch argues that the final EIR did not adopt the VMT threshold, or any other threshold, to assess the significance of the project's in-Basin traffic on the Basin's air quality or the lake's water quality, individually or cumulatively.

### 1. Legal background and standard of review

CEQA requires an agency to prepare an EIR "whenever it can be fairly argued on the basis of substantial evidence that the project may have significant environmental impact." (*No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 75.) The EIR must identify and describe a proposed project's significant and potentially significant effects on the environment. (§ 21100, subd. (b); Guidelines, § 15126.2(a).) A significant effect is defined as a substantial or potentially substantial adverse change in the environment. (§§ 21068, 21100(d).) The environment consists of the physical conditions "which exist within the area which will be affected by a proposed project," including air and water. (§ 21060.5.)

21

To determine whether the project will substantially affect the environment, the EIR first must describe the existing physical conditions in the project's vicinity. (Guidelines, § 15125, subd. (a).) The EIR's description of the existing environmental conditions establishes "a baseline against which predicted effects can be described and quantified." (*Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* 2013) 57 Cal.4th 439, 447.)

The EIR must describe the existing physical conditions from both a local and regional perspective. (Guidelines, § 15125, subd. (a)(1).) "Knowledge of the regional setting is critical to the assessment of environmental impacts. *Special emphasis should be placed on environmental resources that are rare or unique to that region and would be affected by the project.* The EIR must . . . permit the significant effects of the project to be considered in the full environmental context." (Guidelines, § 15125, subd. (c), italics added.)

The scope and detail of an EIR's discussion of the regional environmental setting is driven by the scope and extent of the project's potential impacts. "The description of the environmental setting shall be no longer than is necessary to provide an understanding of the significant effects of the proposed project and its alternatives." (Guidelines, § 15125, subd. (a).) The environment to be considered is "the area in which significant effects would occur either directly or indirectly as a result of the project." (Guidelines, § 15360.) The description must allow the reader to assess and analyze the project's potential impacts. (*County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 953-954.) "Specific information about particular characteristics of the environmental setting may be required when necessary to determine the significance of an impact." (Kostka & Zischke, *supra*, § 12.17.)

After establishing the existing environmental setting, the lead agency assesses a proposed project's potential impact on the environment by examining in the EIR the changes that would occur to the existing physical conditions if the project were

implemented.  (Guidelines, § 15126.2, subd. (a).)  "The fundamental goal of an EIR is to inform decision makers and the public of any significant adverse effects a project is likely to have on the physical environment."  (*Neighbors for Smart Rail v. Exposition Metro Line Construction Authority, supra*, 57 Cal.4th at p. 447.)

All phases of the project must be considered.  (Guidelines, § 15126.)  The EIR must describe the project's direct and reasonably foreseeable indirect environmental effects and analyze them in both the short-term and the long-term.  (Guidelines, §§ 15126.2, subd. (a); 15064, subd. (d).)  It should emphasize the specific effects in proportion to their severity and their probability of occurrence.  (Guidelines, § 15143.)

The EIR must also analyze the project's cumulative impacts.  A cumulative impact on the environment is an impact created as a result of the combination of the project's impacts with other projects causing related impacts.  (Guidelines, § 15130, subd. (a)(1).)  The EIR must analyze a project's cumulative impacts when the project's incremental effect is cumulatively considerable.  (Guidelines, § 15130.)

After examining a potential adverse impact, the lead agency must determine in the EIR whether the impact should be classified as significant or less than significant.  (Guidelines, § 15064, subd. (b)(1).)  This determination is important, as the lead agency must describe mitigation measures in the EIR for each potentially significant environmental impact it identifies.  (§ 21100, subd. (b)(3); Guidelines, § 15126.4.)  The EIR must also describe a reasonable range of alternatives to the project that eliminate or reduce significant environmental impacts.  (Guidelines, § 15126.6, subds. (a)-(b).)

The lead agency's determination of an adverse impact's significance "calls for careful judgment" and must be based to the extent possible on scientific and factual data.  (Guidelines, § 15064, subd. (b).)  The lead agency has discretion to formulate standards of significance to make this determination.  (*Clover Valley Foundation v. City of Rocklin* (2011) 197 Cal.App.4th 200, 243.)  These standards may be based on, among other sources, quantitative, qualitative, or performance-level thresholds of significance adopted

23

by the lead agency or performance or significance standards adopted or recommended by regulatory agencies.  (Guidelines, § 15064.7.)

If the lead agency determines that a possible significant effect will not be significant and therefore not discussed in detail in the EIR, the EIR must contain a statement explaining the reasons for this determination.  (Guidelines, § 15128.)

We review an agency's compliance with CEQA when making a quasi-legislative decision, such as approving a specific plan, for a prejudicial abuse of discretion.  "Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence."  (§ 21168.5; *Western States Petroleum Assn. v. Superior Court, supra*, 9 Cal.4th at p. 568.)

"In a CEQA case, the appellate court's review 'is the same as the trial court's:  [It] reviews the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo.'  (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427.)  The reviewing court independently determines whether the record 'demonstrates any legal error' by the agency and deferentially considers whether the record 'contains substantial evidence to support [the agency's] factual determinations.'  (*Ibid*.)  . . .  If the agency's determination 'involves pure questions of law, we review those questions de novo.'  ([*Sierra Club v*.] *County of Sonoma* [(2017)] 11 Cal.App.5th [11,] 24.)"  (*Protecting Our Water and Environmental Resources v. County of Stanislaus, supra*, 10 Cal.5th at p. 495.)

We review an EIR's description of the existing environmental setting for substantial evidence.  "[A]n agency enjoys the discretion to decide, in the first instance, exactly how the existing physical conditions without the project can most realistically be measured, subject to review . . . for support by substantial evidence."  (*Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 328.)  Nonetheless, the California Supreme Court "insist[s] that CEQA analysis employ a realistic baseline that will give the public and decision makers the most accurate picture

practically possible of the project's likely impacts." (*Neighbors for Smart Rail v. Exposition Metro Line Construction Authority, supra*, 57 Cal.4th at p. 449.)

We also review an EIR's determination of a potential impact's significance for substantial evidence. (Guidelines, § 15064, subd. (f).) " '[A] lead agency has the discretion to determine whether to classify an impact described in an EIR as "significant," depending on the nature of the area affected.' " (*Clover Valley Foundation v. City of Rocklin, supra*, 197 Cal.App.4th at p. 243, quoting *Eureka Citizens for Responsible Government v. City of Eureka* (2007) 147 Cal.App.4th 357, 375.)

For purposes of CEQA, substantial evidence means "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (Guidelines, § 15384, subd. (a); *Laurel Heights I, supra*, 47 Cal.3d at pp. 392-393.) We presume the lead agency's determination is correct and resolve reasonable doubts in favor of the agency's decision. The project opponents must establish that no substantial evidence supports the determination. (*State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674, 723.)

We apply a mixed standard of review to determine the adequacy of an EIR's discussion of an impact. "The determination whether a discussion is sufficient is not solely a matter of discerning whether there is substantial evidence to support the agency's factual conclusions. [¶] The ultimate inquiry, as case law and the CEQA guidelines make clear, is whether the EIR includes enough detail 'to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project.' [Citations.] The inquiry presents a mixed question of law and fact. As such, it is generally subject to independent review. However, underlying factual determinations—including, for example, an agency's decision as to which methodologies to employ for analyzing an environmental effect—may warrant deference. [Citations.] Thus, to the extent a mixed question requires a determination whether statutory criteria

25

were satisfied, de novo review is appropriate; but to the extent factual questions predominate, a more deferential standard is warranted." (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 515-516 (*County of Fresno*).)

Also, whether an EIR has omitted information that CEQA requires to be included is a procedural question subject to de novo review. (*Banning Ranch Conservancy v. City of Newport Beach* (2017) 2 Cal.5th 918, 935 (*Banning Ranch*).)

"[I]n reviewing an EIR's discussion, we do not require technical perfection or scientific certainty: ' " '[T]he courts have looked not for an exhaustive analysis but for adequacy, completeness and a good-faith effort at full disclosure.' " ' (*California Native Plant Society v. City of Santa Cruz* [(2009)] 177 Cal.App.4th [957,] 979; accord *Laurel Heights I*, *supra*, 47 Cal.3d at p. 406; see Guidelines, § 15151 ['An evaluation of the environmental effects of a proposed project need not be exhaustive, but the sufficiency of an EIR is to be reviewed in the light of what is reasonably feasible'].)" (*County of Fresno, supra*, 6 Cal.5th at p. 515.)

If we conclude the EIR does not satisfy CEQA, we must determine if the error is prejudicial. "An omission in an EIR's significant impacts analysis is deemed prejudicial if it deprived the public and decision makers of substantial relevant information about the project's likely adverse impacts. Although an agency's failure to disclose information called for by CEQA may be prejudicial 'regardless of whether a different outcome would have resulted if the public agency had complied' with the law (§ 21005, subd. (a)), under CEQA 'there is no presumption that error is prejudicial' ([*id.*], subd. (b)). Insubstantial or merely technical omissions are not grounds for relief." (*Neighbors for Smart Rail v. Exposition Metro Line Construction Authority, supra*, 57 Cal.4th at p. 463 [no prejudicial error where compliance with CEQA would not have produced any substantially different information].)

26

## 2. Sufficiency of the EIR's analysis

Initially, we disagree with Sierra Watch's sweeping assertion that the EIR does not at all address the Basin's existing characteristics and the project's potential impacts on Basin's resources. The EIR described the regional setting, including the Tahoe Basin, in its resource chapters to the extent the County believed the project may affect that resource. The EIR explained existing Basin conditions and the project's potential impacts to those conditions with regard to the project's location, Basin land use, population, employment and housing, biological resources, cultural resources, visual resources, and transportation and circulation.

Sierra Watch does not further challenge the EIR's discussion of those resources' regional settings or the project's impacts on those resources. Rather, it focusses its argument on the EIR's description of, and its analysis of potential impacts to, Basin air quality and Lake Tahoe water quality; specifically, whether project-generated vehicular traffic will significantly impact the Basin's air quality and the lake's water quality.

Substantial evidence before the County supported a fair argument that project-generated vehicle emissions in the Lake Tahoe Basin could potentially impact the Basin's air and water quality and thus should have been addressed in the draft EIR. Before the County began preparing the EIR, League to Save Lake Tahoe and other environmental organizations responding to the notices of preparation twice stated the project's traffic would increase Basin VMT and impact the Basin's air quality and the lake's water quality, and they asked the County to address those potential impacts. These assertions, based on the fact the project would increase in-Basin VMT, constituted substantial evidence that a fair argument could be made that the project would significantly impact the environment in this manner.

The County asserts that these comments did not qualify as substantial evidence because they were interpretations of technical or scientific information that required

27

expert evaluation. They were not. Substantial evidence includes facts and reasonable assumptions based on fact such as Sierra Watch's, and expert opinion was not required to assert that the project's in-Basin traffic would increase Basin VMT and could thereby impact the Basin's air and water quality. The TRPA threshold had publicly stated this conclusion for years. Factual statements by members of the public may constitute substantial evidence supporting a fair argument of potential significant impact. (*Pocket Protectors v. City of Sacramento* (2004) 124 Cal.App.4th 903, 928.)

Other evidence in the record indicated the project's traffic could potentially affect the Basin's air quality and the lake's water quality. The Lake Tahoe TMDL, which the County participated in developing but only briefly introduced into the environmental review, established that vehicle emissions and the sediment and dust that vehicles create in the Basin contribute to Lake Tahoe's degraded transparency and clarity. Before the planning commission, the County's EIR consultant confirmed the point. She described the potential environmental impact thusly: "The inputs to the lake of nitrogen, phosphorus and fine sediment are from [among other sources] roadway abrasives that get crushed by tires, which is the whole issue of traffic and the VMT in the basin . . . . It has been noted as several people mentioned that vehicle emissions, particularly nitrogen oxides are a source of that material into the lake. . . . [¶] The project does generate cars. It does generate cars that will drive into the basin. Those cars do have emissions and some of those emissions are nitrogen oxides. [¶] So the key obligation to reduce pollutants to the lake from these emissions are to reduce vehicle miles . . . ."

This is substantial evidence that the in-Basin vehicle traffic which the project will generate may have a significant effect on the Tahoe Basin's air quality andLake Tahoe's water quality. The issue before us is whether the EIR sufficiently described the regional setting and analyzed these potential impacts in the manner required by CEQA and whether its conclusions are supported by substantial evidence.

### (a)     Environmental setting

There is no dispute that Lake Tahoe and the Lake Tahoe Basin are unique resources and were entitled to special emphasis in the EIR's description of the existing physical conditions to the extent the project could potentially affect them.  (Guidelines, § 15125, subd. (c).)  Because the project's in-Basin traffic could potentially impact the Basin's air quality and water quality, CEQA required the EIR to discuss the Basin's existing air and water quality so that the significance of the potential impact could be determined.

### (1)     Existing regional air quality

As set forth above, the EIR's discussion of existing regional air quality consisted of descriptions of ambient conditions in the Truckee-Tahoe area and the in-Basin VMT.  Except for the measurements of $PM_{10}$, the EIR provided measurements of ambient levels and attainment statuses of ozone, nitrogen dioxide, and sediment particles and source inventories of pollutants measured in the Mountain Counties Air Basin adjacent to  the Tahoe Basin.

The measurements and source inventories from the Mountain Counties Air Basin appear at first glance not to provide the needed information.  Contrary to applicants' counsel's assertion, the Tahoe Basin is not in the Mountain Counties Air Basin.  The Tahoe Basin is its own regulatory air basin, the Lake Tahoe Air Basin.  (Cal. Code Regs., tit. 17, §§ 60111, subds. (h), (i); 60133.)

Sierra Watch claims more information specifically of the Tahoe Basin's air quality was required.  However, based on the information in the record, substantial evidence supports the County's exercise of discretion to rely on the data it relied upon and to reject what data from the Lake Tahoe Air Basin existed.  The Placer County Air Pollution Control District stated that the Placer County portion of the Lake Tahoe Air Basin was in

nonattainment for the state $PM_{10}$ standard, but the EIR already disclosed that fact with the Basin's $PM_{10}$ measurements from the South Lake Tahoe monitoring station.

Sierra Watch contends the raw $PM_{10}$ data from South Lake Tahoe lacked "essential contextual information needed by readers to assess the Project's actual impacts" on the Basin's air quality. The difficulty, though, was how much other reliable information was available for the County to describe the existing setting. Sierra Watch does not offer what information was missing.

The EIR stated that data from monitoring stations in Kings Beach and Tahoe City were not credible enough to be included. The California Air Resources Board, the source of much of the EIR's air quality information, recorded that no monitoring data on criteria pollutants were available from the Placer County portion of the Lake Tahoe Air Basin from 2005 through 2011.

In its reply brief, Sierra Watch claims the County had access to measurements of the Basin's air quality produced by TRPA. Arguments not properly raised in the opening brief are disregarded. (*Julian v. Hartford Underwriters Insurance Co.* (2005) 35 Cal.4th 747, 761, fn. 4.) The argument also does not establish an abuse of discretion. The record indicates that TRPA obtained data on Basin levels of $PM_{10}$ from the South Lake Tahoe monitoring station, on ozone from monitors in Incline Village and South Lake Tahoe, and on $PM_{2.5}$ from a monitor at Bliss State Park. Although TRPA relied on this data to determine whether the Basin was in attainment of TRPA thresholds for those pollutants, it admitted that the data from those stations were intermittent, and the spacing and density of monitoring sites in the Tahoe Basin were insufficient to know the extent of how maximum and minimum pollutant concentrations were distributed throughout the Basin. This was particularly true of ozone and $PM_{2.5}$, measurements of which the EIR obtained from the monitoring stations in Truckee. With this lack of confidence in TRPA's Basin air data, the County was within its discretion not to consider it.

The other measurement of existing Basin air quality was TRPA's estimate of the Basin's 2010 VMT, which the final EIR disclosed. Sierra Watch claims the 2010 estimate was outdated and did not satisfy CEQA's requirement for a discussion of the environmental setting. There is no evidence, however, that a more recent estimate was available when the EIR was prepared. And, the disclosure of existing VMT was in addition to the description of the existing air quality the EIR provided.

Under these circumstances, we cannot say the County abused its discretion in the manner in which it described the regional air quality setting. It used reliable data specific to the Tahoe Basin that was available. Substantial evidence supports its determinations in making the description.

### (2)    Existing lake water quality

The EIR's discussion of Lake Tahoe's existing water quality consists solely of the discussion in the final EIR of the Basin's existing VMT and the reference to the Lake Tahoe TMDL.

The County contends it was not required to describe Lake Tahoe's water quality any further because development authorized under the project would not be located in the Tahoe Basin, and the project would not cause runoff to flow into the Basin. It also claims it was not required to describe the lake's water quality because the in-Basin VMT that the project would generate was consistent with and "accounted for" in the Lake Tahoe TMDL.

Because the EIR was required to address the potential impact that project-generated traffic may have on Lake Tahoe's water quality, it was required to describe the existing water quality to the extent necessary and feasible to determine whether the potential impact would be significant, particularly because Lake Tahoe is a unique resource entitled to special emphasis. (Guidelines, §§ 15125, subds. (a), (c); 15360; 15125.) We recognize that the project's stormwater will not drain into the lake, a feature

31

that eliminates a major source of the project's potential contribution to the lake's declining clarity. However, that fact does not eliminate the potential impact that project-generated traffic may have on the Basin's water quality.

In *Sierra Watch v. Placer County* (2021) 69 Cal.App.5th 86 (to avoid confusion, we refer to the case using part of the real party's name, *Squaw Valley*), a panel of this court determined that an EIR's omission of a description of Lake Tahoe's existing water quality was deficient. The proposed project in that case was a resort to be built in Olympic Valley (formerly Squaw Valley) a few miles northwest of Lake Tahoe. Similar to the EIR before us, the EIR in *Squaw Valley* did not describe the lake's current water quality or any description of the lake as part of setting forth the existing regional setting. The final EIR explained the Basin's existing VMT and the amount of VMT the project would add. However, the EIR did not discuss or intimate any relationship between VMT and the lake's clarity and water quality. (*Id*. at pp. 99.)

Here, the final EIR briefly explained the relationship between VMT and water quality. It stated that historically, TRPA had posited that more VMT would result in increased traffic congestion and increased nitrate loading into the atmosphere and subsequent deposition into Lake Tahoe. It disclosed TRPA's VMT threshold, that the Basin's existing VMT was below that threshold, and how much VMT the project would add to the Basin. Thus, unlike in *Squaw Valley*, the public was able to understand the significance of existing VMT and the project's impact as expressed under that standard.

However, existing VMT is not truly a description of the lake's physical environment. The EIR must describe the existing physical conditions. (Guidelines, § 15125, subd. (a)(1).) The EIR did not describe the lake's existing physical water quality.

Contrary to the County's argument, stating that the project's VMT was accounted for in the Lake Tahoe TMDL did not excuse a description of the lake's existing water quality. CEQA requires an EIR to describe existing resources that may be affected by the

32

project, and Lake Tahoe's water quality was one of those resources. Explaining that knowledge of the regional environmental setting "is critical to the assessment of environmental impacts," the Guidelines require "special emphasis" to be placed on the description of existing environmental resources "that are rare or unique to that region and would be affected by the project." (Guidelines, § 15125, subd. (c).) Simply pointing to the TMDL did not meet this requirement.

The TMDL provides a wealth of information regarding the lake, including a description of its existing water quality. However, CEQA requires an EIR to summarize the data it relies on and to contain a meaningful analysis of that data. (*County of Amador v. El Dorado County Water Agency, supra,* 76 Cal.App.4th at pp. 955-956.) The EIR did not provide that type of summary of the TMDL or analysis of its data. We thus conclude the County abused its discretion by not describing Lake Tahoe's existing water quality.

(b)     Analysis of potential impacts

The County claims the EIR's air quality analysis, its discussion of the project's VMT under the TRPA threshold, and its reference to the Lake Tahoe TMDL adequately addressed the project traffic's potential impact on Lake Tahoe's air and water quality and was supported by substantial evidence. We agree in part.The EIR concluded that the project's individual impacts on regional air quality, including emissions of nitrogen from vehicular sources, were not significant. It reached this conclusion by determining that the project's emissions would not exceed a threshold of significance approved by the Placer County Air Pollution Control District, which includes the Lake Tahoe Air Basin as well as the Mountain Counties Air Basin.

Under the Air Pollution Control District's threshold, project emissions of reactive organic gases, nitrogen oxides, or $PM_{10}$ that exceed 82 pounds per day are deemed significant. The EIR stated that the project's maximum daily operational emissions of

these pollutants, including emissions from mobile sources such as vehicles, would not exceed 82 pounds per day, and thus would be less than significant.

However, the Air Pollution Control District has a different threshold for cumulative impacts. Under that threshold, project emissions of reactive organic gases or nitrogen oxides, including vehicular emissions, that exceed 10 pounds per day are deemed significant. The project's emissions of both of those pollutants will exceed 10 pounds per day, and thus are cumulatively significant. To mitigate this impact, the EIR directed developers to ensure project emissions of reactive organic gasses do not exceed the standard by incorporating design features to reduce nitrogen oxide emissions; reducing emissions off-site by participating in an offsite mitigation program and funding energy-efficiency, vehicle, and trip-reduction measures; and by paying impact fees to the Air Pollution Control District's offsite mitigation program. As mitigated, this cumulative impact would be less than significant.

The final EIR also provided an analysis of the project's contribution to in-Basin VMT. As explained above, the EIR did not use TRPA's VMT threshold as a threshold of significance, but it showed that the project's VMT would not cause the VMT threshold to be exceeded. The project would increase in-Basin VMT by 0.7 percent. Any increase in VMT would be mitigated by payment of fees to support expanded transit services, as required by Mitigation Measure 10-5.

Responding to a comment about sediment deposition in Lake Tahoe due to increased traffic, the final EIR repeated that operation of the project would not exceed the thresholds of significance established by the Air Pollution Control District. Moreover, and as previously mentioned, any project-related vehicle trips into the Tahoe Basin would be consistent with the total VMT that was already accounted for and addressed in the Lake Tahoe TMDL.

Sierra Watch claims the EIR's analysis was inadequate. Sierra Watch argues the County was required to utilize TRPA's VMT threshold or the science behind it to

34

determine the significance of the project's impacts, as that was the best science available to evaluate the project's impacts on the Basin's air and water quality. Instead, the EIR did not determine whether the impacts were significant under any standard.

Sierra Watch claims that although the final EIR addressed the VMT threshold, it did not adopt it as a standard of significance, and even if it had, it applied it incorrectly. The TRPA threshold is a cumulative threshold, and merely determining the project's VMT would not cause the threshold to be exceeded avoided determining whether the project individually would impact the Basin. Additionally, the final EIR did not determine the project's cumulative impact on VMT in combination with other current, past, and present projects.

In its reply brief, Sierra Watch claims the EIR did not comply with CEQA when it evaluated impacts under the thresholds of significance established by the Air Pollution Control District. It claims those standards were not designed to protect the Basin's unique resources.

We address first the County's decision not to utilize TRPA's thresholds of significance or the science behind them, including the VMT standard.

### (1) Thresholds of significance

CEQA authorizes a lead agency to utilize a threshold of significance or environmental standard adopted by a public agency. (Guidelines, § 15064.7, subds. (c), (d).) Under this authority and other provisions of CEQA, the County had discretion to determine whether to rely on TRPA's VMT threshold.

For purposes of this project, CEQA considered TRPA to be an agency with "jurisdiction by law." An agency with jurisdiction by law is, among other meanings, a public agency that "exercise[s] authority over resources which may be affected by the project." (Guidelines, § 15366, subd. (a)(3).) By comparison, an agency other than the lead agency having jurisdiction by law which must exercise discretionary authority over a

project in order for the project to proceed is a "responsible agency." (*Id*., subd. (c); § 21069.) A "trustee agency" is a state agency that has jurisdiction by law over natural resources affected by a project "that are held in trust for the people of the State of California." (§ 21070.)

CEQA requires a lead agency to consult with and obtain comments from "each responsible agency, trustee agency, [and] any public agency that has jurisdiction by law with respect to the project[.]" (§ 21153, subd. (a); Guidelines, § 15086, subd. (a)(3).) If "an agency having jurisdiction over natural resources affected by a project" identifies a significant environmental effect, it must either "submit to the lead agency complete and detailed performance objectives for mitigation measures which would address the significant effects on the environment identified by the . . . agency having jurisdiction over natural resources affected by the project, or refer the lead agency to appropriate, readily available guidelines or reference documents." (§ 21081.6, subd. (c).)

CEQA, however, does not require the lead agency to accept and utilize the threshold or significance standards which the jurisdiction-by-law agency used to determine the impact was significant. It grants the lead agency discretion not to utilize the other agency's thresholds and environmental standards and to formulate standards of significance of its own for determining the significance of a project's impact. (Guidelines, §§ 15064, subd. (b)(1), 15064.7, subds. (c), (d).)

*Banning Ranch, supra*, 2 Cal.5th 918, explains this point. There, the real party proposed a large residential and commercial development on previously undeveloped land that was also within the coastal zone as established in the Coastal Act. (§ 30001.5.) The Coastal Act protects environmentally sensitive habitat areas in the coastal zone against significant disruption by development. (§ 30240.) The site included potential special status habitats, and the development called for a road that would disrupt them. (*Banning Ranch, supra*, at pp. 925-927.) The city's EIR for the project did not identify potential habitats or discuss them in any substantive detail. The city contended that

CEQA did not require its EIR to discuss the potential habitats because the California Coastal Commission, in its review of the project as a responsible agency for a development permit, would identify potential habitats and the project's impacts on them. (*Id*. at pp. 930-932.)

The Supreme Court rejected the argument, holding that CEQA required a lead agency to integrate a project's CEQA review with all other related public agencies' planning and environmental regimes. (*Banning Ranch, supra*, 2 Cal.5th at pp. 936-937.) Of relevance here, the city supposed that if it were required to identify potential habitats in the EIR, it would have to accept the habitat designations proposed by Coastal Commission staff, which the city disputed. The Supreme Court stated, "That is not the case. An EIR is an informational document, not a settlement agreement or a memorandum of understanding. The lead agency may disagree with the opinions of other agencies. [Citations.] In order to serve the important purpose of providing other agencies and the public with an informed discussion of impacts, mitigation measures, and alternatives, an EIR must lay out any competing views put forward by the lead agency and other interested agencies. (See § 21061; *Laurel Heights I*, *supra*, 47 Cal.3d at p. 391.) The Guidelines state that an EIR should identify '[a]reas of controversy known to the lead agency including issues raised by [other] agencies.' (Guidelines, § 15123, subd. (b)(2).) 'Disagreement among experts does not make an EIR inadequate, but the EIR should summarize the main points of disagreement among the experts.' (Guidelines, § 15151.) '[M]ajor environmental issues raised when the lead agency's position is at variance with recommendations and objections raised in the comments must be addressed in detail.' (Guidelines, § 15088, subd. (c).)" (*Banning Ranch, supra*, 2 Cal.5th at p. 940.)

Here, although TRPA stated the project would significantly impact the physical environment by increasing vehicle trips and vehicle miles traveled in the Basin, the County in this instance had discretion to reasonably disagree with the standards TRPA

used to make its determination and with the determination itself even though the County was required to consult with TRPA. (*Banning Ranch, supra*, 2 Cal.5th at p. 936; see *Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 543-544 [city not required to apply county's significance standard for traffic impacts where project would be annexed to the city].)

Sierra Watch asserts that the *Banning Ranch* court's requirement that the city's EIR in that case also address matters and determinations that the Coastal Commission would address in its review of the project applies here. Similar to that case, the record here establishes that the project may impact the Basin's resources, and TRPA has established threshold carrying capacities to address those impacts. The difference, however, is that in *Banning Ranch*, the Coastal Commission was a responsible agency with permitting authority over the project. TRPA has no permitting authority in this matter. Thus, the EIR was not required to integrate its review with TRPA's planning and environmental regimes.

That is not to say the EIR did not need to address TRPA's and others' analysis of the review and their suggestions to use the VMT threshold. CEQA required the EIR to summarize "[a]reas of controversy known to the lead agency including issues raised by agencies and the public; and . . . [i]ssues to be resolved including the choice among alternatives and whether or how to mitigate the significant effects." (Guidelines, § 15123, subd. (b)(2), (3).) "In particular, the major environmental issues raised when the lead agency's position is at variance with recommendations and objections raised in the comments must be addressed in detail giving reasons why specific comments and suggestions were not accepted." (Guidelines, § 15088, subd. (c).)

The EIR summarized this area of controversy. The draft EIR stated that one area of known controversy was the project's "Tahoe Basin impacts, generally: the effect of land use decisions in Placer County to affect lands under the jurisdiction of the Tahoe Regional Planning Agency." The final EIR addressed TRPA's and the public's

comments on the draft EIR by addressing and applying TRPA's VMT threshold and explaining why it did not employ the threshold as a standard of significance.

The County's discretion in selecting standards of review is not unfettered. The fact the County had discretion to determine a standard of significance is not a sufficient ground by itself to justify not using TRPA's thresholds or the science behind them where the EIR offers no other scientifically based information on which to determine the impact's significance. (See *Cleveland National Forest Foundation v. San Diego Assn. of Governments* (2017) 3 Cal.5th 497, 515 (*Cleveland National Forest I*) [agency's discretion not to use standards from a state executive order is not by itself sufficient grounds for rejecting the state standards and the science supporting them].)

Here, the EIR provided other scientifically-based information on which it determined the significance of the project's impact on Basin air quality—the thresholds of significance adopted by the Air Pollution Control District. This fact distinguishes this case from a relevant portion of *Squaw Valley, supra*, 69 Cal.App.5th 86, relied upon by Sierra Watch at oral argument. In *Squaw Valley*, a panel of this court agreed with Sierra Watch that the EIR's analysis of the resort's traffic impacts on Lake Tahoe and the Basin's air quality violated CEQA. Sierra Watch criticized the County for not utilizing TRPA's VMT threshold as a threshold of significance. The EIR mirrored much of the analysis in the EIR before us, explaining how other EIRs had utilized the VMT standard but ultimately deciding not to use the standard as a threshold of significance. Unlike in the case before us, however, the *Squaw Valley* EIR did not provide an alternative threshold of significance and did not determine whether the impact was significant. (*Squaw Valley, supra*, 69 Cal.App.5th at pp. 100-102.) In our case, the EIR provided a threshold of significance that was applied to regional vehicle emissions and all other operational emissions, and it determined the significance of the impact on regional air quality, including the Basin. *Squaw Valley's* holding does not apply to this case.

39

In its reply brief, Sierra Watch argues for the first time that the County abused its discretion by relying on the Air Pollution Control District's standards. It asserts the EIR's analysis "masked the impacts to the Tahoe Air Basin, as Placer District's standards were not designed to protect the Basin's unique resources." Again, arguments not raised in an opening brief are forfeited. (*Julian v. Hartford Underwriters Insurance Co., supra*, 35 Cal.4th at p. 761, fn. 4.) Moreover, no evidence in the record supports Sierra Watch's assertion. The portions of the Lake Tahoe Air Basin that are within Placer County are within the Air Pollution Control District. (Health & Saf. Code, § 40002.) The District is responsible for adopting and enforcing rules and regulations to achieve and maintain state and national air quality standards in areas under its jurisdiction, including the Tahoe Basin. (Health & Saf. Code, § 40001, subd. (a).)

We recognize that TRPA has its own air quality thresholds. Some are more strict than state or federal standards, others less strict. In some instances, TRPA has no standard where the state does, and visa versa. For example, TRPA has no standard for measuring particulate matter. The Air Pollution Control District, however, has standards for $PM_{10}$, and the EIR determined the project did not violate that standard. Both TRPA and the Air District have standards for oxides of nitrogen ($NO_x$). TRPA's standard, a cumulative standard, is maintaining Basin emissions at or below 9.4 tons per day. As stated above, the District's individual project standard is 82 pounds per day, and its cumulative project standard is 10 pounds per day per source. Nothing in the record indicates the relation between these standards nor establishes that the Air District's standard does not protect Basin resources.

Certainly, the Air Pollution Control District does not have a VMT standard. However, the EIR applied the Air District's threshold of significance in a regional context to all project emissions, including vehicular emissions. Under these

40

circumstances, the County did not abuse its discretion in utilizing the Air District's thresholds of significance instead of TRPA's VMT threshold to address emission impacts to the Tahoe Basin's air quality and the lake's water quality, and substantial evidence supports the EIR's analysis and conclusions on those impacts.

### (3)    Remainder of impact analysis

Although the EIR satisfactorily addressed the project's impacts which emissions, it did not adequately address the impacts which crushed abrasives and sediment from project-generated traffic may have on the lake.

To the extent the VMT analysis in the final EIR was to be used to address this water quality impact, it was inadequate for reasons raised by Sierra Watch. By not using the VMT threshold as a threshold of significance and by not providing an alternative threshold to measure this impact, the EIR did not determine the significance of the potential impact individually or cumulatively.

And, as explained earlier, the reference to the Lake Tahoe TMDL was inadequate. There is no dispute that the TMDL does in fact address this impact extensively on a Basin-wide perspective. But the EIR did not incorporate the TMDL by reference, and the public and decision-makers were entitled to a summary of the relevant data the County relied on from the TMDL, an analysis of that data, and a determination of the potential impact's significance individually and cumulatively. (*County of Amador v. El Dorado County Water Agency, supra,* 76 Cal.App.4th at pp. 955-956.) Simply stating, as the final EIR does, that the TMDL accounts for all VMT up to the TRPA threshold, and that the project's VMT must therefore be included in that analysis because it does not cause the VMT threshold to be exceeded, does not provide the required description of the County's analysis. The statement itself is problematic because the EIR did not analyze the project's cumulative impact to the VMT threshold. As a result, the reader cannot

41

determine from the EIR whether in fact the VMT threshold will not or has not been exceeded and the TMDL's analysis thus incorporated the project's in-Basin VMT.

The County claims the record shows that the project would not cause an exceedance of the VMT threshold on a cumulative basis. That information is not in the EIR. Rather, it appears in a response the County made to comments that were submitted *after* the final EIR was circulated. Discussion in the administrative record cannot substitute for analysis required to be in the EIR. "[T]o the extent an agency omits an adequate discussion of a project's potential impacts in its EIR, it cannot afterward 'make up for the lack of analysis in the EIR' through post-EIR analysis." *Squaw Valley, supra*, 69 Cal.App.5th at p. 103.) CEQA required the cumulative impact analysis to be in the EIR. (CEQA Guidelines, §§ 15120, subd. (c); 15130, subd. (a).)

At oral argument, counsel for the County claimed the TMDL incorporated the project's traffic because the TMDL was based on TRPA's 2011 regional traffic plan, which had also incorporated the project's traffic into its analysis. That may be so, but that does not address the project's cumulative impact on the VMT threshold, and none of that discussion appears in the EIR, where CEQA required it to be. Because of the comprehensive research and analysis contained in the TMDL, it should not be difficult for the County feasibly to analyze the potential impact to the Lake's water quality and summarize and publish its reasoning in a manner consistent with CEQA.

C.     Revisions to draft EIR's climate analysis

Both Sierra Watch and the Committee raise this issue. We address both parties' contentions in this section.

Sierra Watch contends the County violated CEQA by not recirculating the draft EIR after adding new information in the final EIR about the project's impact to climate change which allegedly revealed more severe climate impacts. Sierra Watch further claims that the County violated CEQA by not reconsidering in the final EIR the efficacy

42

of the draft EIR's climate impact mitigation measure in light of the new information added to the final EIR, and because the revisions to that mitigation measure do not guarantee the impact will be mitigated.

In its appeal, the Committee also claims the revised mitigation measure does not comply with CEQA.

We conclude substantial evidence supports the County's decision not to recirculate the EIR, but we also conclude the mitigation measure does not satisfy CEQA.

### 1. Legal background

Understanding this issue requires another detailed background statement. California's attempts to reduce greenhouse gas emissions and their effect on climate change began in 2005 when the Governor signed Executive Order S-3-05. This order established total greenhouse gas emission targets for the state. It directed that emissions be reduced to the level of emissions that existed in 1990 by 2020, and to 80 percent below the 1990 level by 2050. The Governor's targets are not mandatory thresholds of significance or enforceable regulations. (*Cleveland National Forest I, supra*, 3 Cal.5th at p. 517.)

The Legislature addressed climate change in 2006, adopting the California Global Warming Solutions Act of 2006. (Stats. 2006, ch. 488, p. 3419 (Assembly Bill 32).) With this legislation, "our Legislature emphatically established as state policy the achievement of a substantial reduction in the emission of gases contributing to global warming. (Health & Saf. Code, §§ 38500, 38501.) More specifically, Assembly Bill 32 calls for reduction of such emissions to 1990 levels by the year 2020. (Health & Saf. Code, § 38550.) The law designates the State Air Resources Board (the Air Board) as the state agency charged with regulating greenhouse gas emissions (*id.,* § 38510) and calls for the Air Board to coordinate with other state agencies to implement the state's reduction goal (*id.,* § 38501, subd. (f)).

"Under Assembly Bill 32, the Air Board was required to determine as accurately as possible the statewide level of greenhouse gas emissions in 1990 and to approve on that basis a statewide emissions limit to be achieved by 2020. (Health & Saf. Code, § 38550.) The Air Board was required to prepare and approve by January 1, 2009, a 'scoping plan' for achieving the 'maximum technologically feasible and cost-effective' reductions in greenhouse gas emissions by 2020. (*Id.,* § 38561, subd. (a).)

"In its 2008 Climate Change Scoping Plan, the Air Board explained that '[r]educing greenhouse gas emissions to 1990 levels means cutting approximately 30 percent from business-as-usual emission levels projected for 2020, or about 15 percent from today's levels.' (Air [Resources] Bd., Climate Change Scoping Plan (Dec. 2008) Executive Summary, p. ES–1 (Scoping Plan).) The Scoping Plan then set out a 'comprehensive array of emissions reduction approaches and tools' to meet the goal" of reducing statewide emissions by approximately 29 percent. (*Center for Biological Diversity v. Department of Fish & Wildlife* (2015) 62 Cal.4th 204, 215-216 (*Newhall Ranch*).) A "business-as-usual" scenario was one that assumed no conservation or regulatory efforts would be in effect in 2020 beyond what was in place when the Air Board made its forecast in 2008. (*Id.* at p. 216.)

Due to the economic downturn that occurred in 2008, the Air Board in 2011 revised its projected level of statewide emissions for 2020. In its revised scoping plan, the Air Board estimated that the state's business-as-usual emissions in 2020 would be 545 million metric tons of carbon dioxide equivalent emissions ($CO_2e$), not 596 million metric tons of $CO_2e$ as originally estimated, and that reducing the 2020 emissions to 1990 levels would require reducing them by approximately 21.7 percent, not 30 percent. (For ease of reference, subsequent refences to "metric tons" in this section I.C. of the opinion refer to metric tons of $CO_2e$.)

In 2015, the Governor signed Executive Order B-30-15 to establish a state greenhouse gas reduction target of 40 percent below 1990 emissions levels by 2030. The

Governor's new target would make it possible for the state to reach the ultimate goal of reducing emissions to 80 percent below 1990 levels by 2050. As of the writing of the EIR, however, neither the Air Board nor the Legislature had adopted an emissions reduction goal beyond 2020.

### 2. Factual background

#### a. Draft EIR's analysis of greenhouse gas emissions

In the draft EIR, the County utilized thresholds of significance developed by the Placer County Air Pollution Control District to determine whether the project's operational emissions of greenhouse gases would significantly impact the environment. These thresholds were intended to evaluate a project for its consistency with the Air Board's reduction targets for 2020 contained in the Air Board's revised Scoping Plan.

For operational emissions, the Air Pollution Control District's thresholds had a two-tier approach. Under tier I, a project's annual emissions of less than 1,100 metric tons of $CO_2e$ were deemed not to have a significant effect on the environment. Under tier II, if a project's annual emissions at full buildout and subject to existing greenhouse gas regulations (the full buildout scenario) exceeded 1,100 metric tons of $CO_2e$ but were at least 21.7 percent less than what its emissions would be in 2020 in a business as usual scenario (referred to in the draft EIR as a "no action taken" scenario), the project would not conflict with the Air Board's revised Scoping Plan, and the lead agency had discretion to determine whether the project's exceedance of tier I's threshold of 1,100 metric tons was a significant impact. The parties refer to the tier II standard as an "efficiency" standard as it attempts to determine the project's "efficiency" of meeting the state's target of reducing statewide greenhouse gas emissions by 21.7 percent of projected business-as-usual 2020 emissions.

Operation of the project would result in greenhouse gas emissions from motor vehicle trips to and from the project; combustion of natural gas for space and water

heating; consumption of electricity and water; conveyance, treatment, and discharge of wastewater; transport and disposal of solid waste; and use of landscaping and snow removal equipment.

Applying the Air Pollution Control District's two-tier threshold, the County first estimated that the project at full buildout, projected to be in 2033, would annually emit 35,865 metric tons of $CO_2e$, far in excess of tier I's threshold of 1,100 metric tons.

For the tier II analysis, the County, assuming full buildout in 2020, determined that the full buildout scenario's emissions would be 23.2 percent less than those from the business as usual scenario. This amount of reduction was greater than, and would not conflict with, the 21.7 percent target in reduced emissions from the statewide business as usual scenario sought by the Air Board's Scoping Plan.

Nevertheless, the County determined that the impact from operational emissions was potentially significant. It reached this conclusion because the project would generate substantial greenhouse gas emissions well above the Air Pollution Control District's tier I level, and because it was not known whether the project in the long term could satisfy future and likely more stringent state efficiency targets.

The Air Board had proposed, but had not adopted, more stringent goals that extended beyond 2020, and the Governor, as mentioned earlier, had set targets to further reduce emissions in Executive Orders B-30-15 (40 percent reduction below 1990 levels by 2030) and S-3-05 (80 percent reduction below 1990 levels by 2050). The EIR stated that although the project would meet the 2020 efficiency target, it was unlikely the project at full buildout could meet long-term greenhouse gas "efficiency aspirations" such as those expressed in Executive Orders B-30-15 and S-3-05 without substantial statewide regulation, such as regulations resulting in more electric vehicles in the fleet mix, more stringent energy efficiency standards for buildings, and an increase in the generation of renewable electricity. Because the project would generate greenhouse gas emissions above the Air District's tier I level, and because it was not known whether the

project could meet future greenhouse gas reduction targets, the County concluded the impact would be potentially significant.

The draft EIR set forth mitigation measure 12-2 to mitigate the impact. That measure obligates the County to require all applicants that apply for subdivision maps within the project after 2020 to demonstrate that operation of the proposed project would be consistent with then-current greenhouse gas emission targets adopted by the state. The applicant must make this demonstration using then-currently adopted regulations and industry-accepted greenhouse gas emission calculation methods, such as the "efficiency" comparison conducted in the draft EIR. If the proposed project achieves or exceeds the reduction target, no further actions will be required. If the project does not achieve the target, then all feasible mitigation measures will be mandated and incorporated into the project to reduce greenhouse gas emissions to the target level.

Despite mitigation measure 12-2, the County concluded that as mitigated, the impact remained potentially significant and was unavoidable. Too many factors remained unknown to conclude otherwise: the absence of post-2020 adopted emissions targets, the effectiveness of regulatory actions already adopted, and the potential application of new regulations and their cost, feasibility, and effectiveness. The EIR stated it would thus be speculative to determine that greenhouse gas impacts would be feasibly mitigated to satisfy the targets likely to be adopted beyond 2020. For that reason, and because the project would generate emissions well above the tier I threshold, the residual impact was potentially significant and unavoidable.

b.     The *Newhall Ranch* decision

While the draft EIR was being circulated, the California Supreme Court issued its decision in *Newhall Ranch, supra*, 62 Cal.4th 204. In that case, the court invalidated an EIR's use of an efficiency analysis based on the Air Board Scoping Plan's statewide reduction mandate to determine the significance of an individual project's greenhouse gas

47

emissions, as was done in the draft EIR here. The EIR at issue in *Newhall Ranch* stated that a large development project would emit 31 percent less greenhouse gases in 2020 than if the project was built in the business as usual scenario. The 31 percent reduction was greater than the 29 percent statewide reduction sought by the Air Board's original Scoping Plan. On that basis, the EIR concluded the impact was less than significant. (*Id*. at pp. 217-218.)

The Supreme Court stated the lead agency "abused its discretion in finding, on the basis of the EIR's business-as-usual comparison, that the project's greenhouse gas emissions would have no cumulatively significant impact on the environment. We [the Supreme Court] reach this conclusion because the administrative record discloses no substantial evidence that Newhall Ranch's *project-level* reduction of 31 percent in comparison to business as usual is consistent with achieving Assembly Bill 32's *statewide* goal of a 29 percent reduction from business as usual, a lacuna both dissenting opinions fail to address. Even using the EIR's own significance criterion, the EIR's analysis fails to support its conclusion of no significant impact." (*Newhall Ranch, supra*, 62 Cal.4th at p. 225.)

The lead agency did not violate CEQA simply by choosing consistency with Assembly Bill 32 and the Scoping Plan's reduction target as a significance criterion. In light of greenhouse gas impacts' global nature and the inevitability of increased greenhouse gas emissions as the state continues to grow, a significance criterion framed in terms of efficiency in meeting the state's target, expressed as a percentage reduction from a hypothetical scenario in which no additional regulatory actions were taken, was superior to a simple numerical threshold. (*Newhall Ranch, supra*, 62 Cal.4th at pp. 220, 225.) The error occurred because "the Scoping Plan nowhere related that *statewide* level of reduction effort to the percentage of reduction that would or should be required from *individual projects,* and nothing [the lead agency] or Newhall has cited in the administrative record indicates the required percentage reduction from business as usual

48

is the same for an individual project as for the entire state population and economy." (*Id.* at pp. 225-226.)

The court provided an example to explain its point. New buildings and infrastructure might have to provide more than a 29 percent reduction in emissions levels because "[d]esigning new buildings and infrastructure for maximum energy efficiency and renewable energy use is likely to be easier, and is more likely to occur, than achieving the same savings by retrofitting of older structures and systems." (*Newhall Ranch, supra*, 62 Cal.4th at p. 226.)

The Supreme Court offered suggestions for how lead agencies could evaluate the significance of a project's greenhouse gas emissions. The agency could use the business as usual approach so long as substantial evidence substantiated what a new land use development at the proposed location must contribute in order to comply with state goals. The agency could also examine the degree to which the project met regulatory programs and performance standards adopted for complying with the statewide goal so long as the programs and standards applied to the elements of the project that generated greenhouse gases. And, the agency could rely on existing numerical thresholds of significance for greenhouse gas emissions, such as the Air Pollution Control District's tier I 1,100 metric ton threshold the County utilized in the draft EIR here. (*Newhall Ranch, supra*, 62 Cal.4th at pp. 229-231; see p. 230, fn. 7, recognizing a 1,100 metric ton threshold used by the Bay Area Air Quality Management District.)

### c. Final EIR's analysis and revisions to the draft EIR

The County addressed *Newhall Ranch* and its impact on the draft EIR's greenhouse gas emissions analysis in the final EIR. It determined that the draft EIR's conclusion that the impact was significant remained unchanged for three reasons. First, the draft EIR had evaluated the project's long-term impacts under the tier I numerical threshold, a threshold that was consistent with *Newhall Ranch's* ruling. Because the

49

project's annual emissions would exceed the tier I threshold, the draft EIR concluded the impact was significant and unavoidable.

Second, because the project's greenhouse gas impacts were found to be significant and unavoidable for other reasons, the draft EIR's conclusion regarding conflicts with the Scoping Plan was immaterial to the overall significance conclusion. The draft EIR used the tier II efficiency threshold "only to determine if the project would 'conflict with [the Air Board's] Scoping Plan for 2020 targets.' [3AR 1573]." *Newhall Ranch* called into question whether this type of efficiency analysis could be used to determine significance based on whether the project was consistent with the Scoping Plan, but it did not question the EIR's other reasons for finding the impact to be significant. Even if a conclusion cannot be drawn regarding conflicts with the Scoping Plan, this would not alter the conclusion that the project's greenhouse gas emissions impact would be significant and unavoidable.

Third, very little of the project if approved would be constructed prior to 2020. The draft EIR's analysis considered buildout by 2020 for illustrative purposes to evaluate how the project matched with the Scoping Plan's 2020 targets. If the County approved the project, the earliest any phase would likely be completed would be 2018. The draft EIR acknowledged this fact by including a detailed discussion of post 2020 greenhouse gas considerations.

The final EIR reviewed other possible methods suggested by the *Newhall Ranch* court for determining the significance of greenhouse gas impacts, but it rejected them. One, an analysis whose link between the actual project and the Scoping Plan's target was supported by substantial evidence, could not be used because the linking substantial evidence did not exist. It was unclear how to develop the evidence to reliably relate a specific land use development project's reductions to the Scoping Plan's statewide goal. The other, compliance with regulatory programs adopted to reach Assembly Bill 32's goals that applied to elements of the project that generated greenhouse gases, was

50

inapplicable because too few of such programs existed that addressed the project's specific impacts, and those that did exist were subject to unknown future revisions.

Regarding the effectiveness of the draft EIR's mitigation measures and whether additional mitigation measures were needed, the final EIR stated that the draft EIR had described several project policies and mitigation measures that would reduce greenhouse gas emissions, such as prohibiting wood-burning stoves and fireplaces and encouraging construction that exceeds current energy codes. However, because many of these policies were not firm and their effectiveness depended on many variables, the draft EIR did not calculate their potential effectiveness. Instead, in mitigation measure 12-2, it required that certain targets be met as subdivision maps were submitted for approval. The measure would ensure that each subdivision map would meet the County's greenhouse gas reduction goas or requirements in place when the map is submitted.

The final EIR stated that the draft EIR's conclusion regarding greenhouse gas emissions would not be changed by its evaluation. The project's emissions would exceed the tier I threshold, future targets were expected but had not been adopted, and compliance with future targets was unknown. Mitigation measures would reduce emissions, as stated in the draft EIR, but the impact would remain potentially significant and unavoidable.

Based on reaching the same conclusion as the draft EIR, the County determined that its considerations in the final EIR did not require it to recirculate the EIR.

As a result of the County's considerations after *Newhall Ranch*, the final EIR made several amendments to the draft EIR. Some described *Newhall Ranch* and stated that the tier II category, which was based on a business as usual model, was not considered as a threshold of significance for the project. Some also deleted explanations of and findings under tier II and stated the efficiency analysis contained in the draft EIR was provided for informational purposes only. The final EIR stated, "There are no

51

current mechanisms available to determine the level of GHG-efficiency needed on a single project in order to determine if it fits within the Scoping Plan targets."

Other amendments reflected new analysis, unrelated to *Newhall Ranch*, which showed that indirect emissions from the project's electricity consumption, and thus the project's total emissions, would be lower than those stated in the draft EIR. The reductions would occur due to the power supplier's decision to comply with a regulatory program which grew out of the 2008 Scoping Plan. As a result of this action, the final EIR projected that the project's annual greenhouse gas emissions at full buildout in 2033 would be 30,427 metric tons. This output was less than the draft EIR's projection of 35,865 metric tons, but still much more than the 1,100 metric tons allowed under the tier I threshold. The impact thus remained significant.

The final EIR also amended the draft EIR to state that attainment of future emissions targets would be partially reliant on new regulations as well as potentially on the degree to which other existing regulatory programs not considered in the EIR, such as Cap-and-Trade regulations, are assumed by the Air Board to have already reduced greenhouse gas emissions. It still remained unlikely that the project at buildout could meet long-term greenhouse gas efficiency aspirations without substantial new statewide regulations. Because the project would generate substantial greenhouse gas emissions, and because it was unknown if the project would be consistent with future greenhouse gas emissions reduction targets, the impact would be potentially significant.

The final EIR amended mitigation measure 12-2 to require that upon submitting a subdivision map for approval, the applicant must establish that operation of the project would be consistent with greenhouse gas emissions targets formally adopted by the state or County and then in existence. The target must be based on substantial linkage between the project (or projects in the County) and statewide greenhouse gas reduction goals, as required by *Newhall Ranch*. If the project achieves or exceeds the target, no mitigation measures will be required. If the project does not meet the target, mitigation measures

will be imposed. The amendment deleted the option of showing compliance based on a business as usual or no action taken scenario.

The final EIR also revised the draft EIR's analysis of the impact's significance after mitigation. Implementation of mitigation measure 12-2 would reduce greenhouse gas emissions, but important factors remained unknown: the effectiveness of existing regulatory programs and the potential application of new targets and regulations and their effectiveness and compliance costs. As a result, it was speculative to determine whether greenhouse gas impacts would be feasibly mitigated to adopted targets. As did the draft EIR, the final EIR concluded that for this reason, and because the project would emit a substantial level of greenhouse gases, the residual impact after mitigation remained potentially significant and unavoidable.

### 3. Discussion

Sierra Watch makes two contentions against the final EIR's analysis of the project's greenhouse gas impacts. First, it contends the County was obligated to recirculate the draft EIR because the final EIR's analysis constituted "significant new information" which under CEQA triggered recirculation. Second, the final EIR violated CEQA because the County did not reconsider the draft EIR's climate mitigation in light of the new impacts revealed in the final EIR, and because the revised mitigation measure does not guarantee the impact will be mitigated. The Committee also contends the revised mitigation measure is not enforceable or feasible.

### a. Recirculation

A lead agency must recirculate an EIR if, after releasing the draft EIR for circulation, it adds "significant new information" to the document. (Guidelines, § 15088.5, subd. (a).) "Significant new information" includes a disclosure showing that "(1) A new significant environmental impact would result from the project or from a new mitigation measure proposed to be implemented[;] (2) A substantial increase in the

53

severity of an environmental impact would result unless mitigation measures are adopted that reduce the impact to a level of insignificance[;] (3) A feasible project alternative or mitigation measure considerably different from others previously analyzed would clearly lessen the significant environmental impacts of the project, but the project's proponents decline to adopt it[; or] (4) The draft EIR was so fundamentally and basically inadequate and conclusory in nature that meaningful public review and comment were precluded." (Guidelines, § 15088.5, subd. (a).)

The lead agency is not required to recirculate the EIR "where the new information added to the EIR merely clarifies or amplifies or makes insignificant modifications in an adequate EIR." (Guidelines, § 15088.5, subd. (b).) Such is the case here.

Sierra Watch asserts that the final EIR adopted a "new" threshold of significance, the Air Pollution Control District's tier I threshold, and that by using this new threshold, the final EIR's analysis revealed that the project would cause "far more severe climate impacts" than the draft EIR had disclosed. Sierra Watch claims the draft EIR did not apply the tier I numerical standard to determine the impact's significance; it applied the tier II efficiency standard. Sierra Watch is incorrect.

As already recited, the draft EIR relied on the tier I threshold and the lack of future emissions targets, not the tier II threshold, to determine the project's greenhouse gas impacts were significant. Although the County analyzed the project under tier II, it did not use the tier II standard as a threshold of significance. Rather, meeting the tier II standard gave the County discretion to determine whether the project's impacts were nonetheless significant. The County exercised that discretion and, without relying on the tier II standard, concluded the project's emissions were significant in part because *they exceeded the tier I standard*. Sierra Watch's argument that the EIR must be recirculated simply because the County analyzed the project under tier II ignores the draft EIR's substantive analysis and findings.

The final EIR did not introduce the tier I threshold as a new threshold. It explained that the draft EIR's efficiency analysis likely did not comply with *Newhall Ranch* because the required substantial evidence to support that analysis was not available. Nevertheless, that analysis was immaterial to the overall significance finding because the draft EIR had concluded the impacts were significant regardless of the efficiency analysis. In other words, even though the draft EIR determined the project's level of emissions would be more efficient than that required by the state's 2020 target, the County did not rely on that fact when it quantified the project's impacts nor when it considered whether the emissions impacts would be significant. Both the draft EIR and the final EIR concluded that the impacts were significant because the project's emissions would far exceed the tier I threshold, a threshold that *Newhall Ranch* had approved using, and because the County could not speculate on significant future impacts without knowing the emissions targets the state would adopt.

Sierra Watch asserts the draft EIR could not have applied both tier I and tier II thresholds because the draft EIR stated it would consider the impact significant if both thresholds were exceeded. The argument is meritless. The EIR's stating it would necessarily find the impact was significant if both thresholds were exceeded did not prevent the County from also concluding the impact was significant under tier I where tier II gave it the discretion to make that finding if its standard was not met.

Sierra Watch argues the final EIR showed the project would have more impacts than was disclosed in the draft EIR because whereas the draft EIR had found the project would not exceed the tier II threshold, the final EIR disclosed the project's emissions would "vastly exceed" the tier I threshold. Sierra Watch ignores that the draft EIR also showed that the project's emissions would vastly exceed the tier I threshold. The draft EIR stated, "As shown in Table 12-2, upon full buildout, [greenhouse gas] emissions associated with operation of the proposed project would exceed the Tier I mass emission threshold of 1,100 [metric tons]." Table 12-2 showed exactly how much the project

55

would have exceeded the tier I threshold. It stated the tier I threshold was 1,100 metric tons, and the project at buildout would produce 35,865 metric tons. The draft EIR's use of the tier II threshold did not change the actual, quantitative impacts the project would create or that the draft EIR disclosed.

Also, at no time did the final EIR reveal that the project's greenhouse gas emissions would impact the environment more severely than the draft EIR disclosed. In fact, contrary to Sierra Watch's assertion that the final EIR revealed "more severe climate impacts," the final EIR concluded that the project's impact would be *less* than that disclosed in the draft EIR. Instead of producing 35,865 metric tons of greenhouse gases as the draft EIR stated, the project would produce 30,427 metric tons. But, just as the draft EIR had done, the final EIR concluded that the impact under tier I remained significant and unavoidable.

Sierra Watch asserts the final EIR disclosed for the first time that the project's impacts would be significant in the short term. The argument requires some explanation. The draft EIR described the greenhouse gas impact thusly: "Annual GHG [greenhouse gas] emissions from project operation would exceed the Tier I mass-emission threshold of 1,100 [metric tons]/year, but would not exceed the GHG efficiency-based Tier II threshold recommended by [the Air Pollution Control District] for 2020. Nevertheless, GHG emissions would be substantial and the project may be less efficient than necessary to achieve GHG reduction targets that could be in place after 2020, when the [project] is built out. Therefore, operation of the project has the potential to result in a substantial contribution to GHG emissions. This impact would be potentially significant."

The final EIR revised this language to read: "Annual GHG emissions from project operation would exceed the Tier I mass-emission threshold of 1,100 [metric tons]/year. GHG emissions would be substantial when the [project] is built out. Therefore, operation of the Specific Plan has the potential to result in a substantial contribution to GHG emissions."

Sierra Watch contends that the final EIR's conclusion revealed for the first time that the project's short-term climate impacts would be significant. We disagree. In both conclusions, the County stated that annual greenhouse gas emissions from project operation would exceed the tier I threshold. The draft EIR did not claim that emission impacts would be less significant in 2020 but significant thereafter. That the draft EIR stated emissions would not exceed the tier II efficiency standard for 2020 did not mean emissions would not exceed the tier I threshold in the short term or necessarily not be significant. Both EIRs disclosed that the project's emissions would exceed the tier I standard *annually*—in the short term and in the long term.

Because the new information provided in the final EIR only clarified or amplified the draft EIR's discussion and conclusions and demonstrated the impact would be less than the draft EIR had disclosed but would remain significant, substantial evidence supported the County's decision not to recirculate the EIR on that basis. (Guidelines, § 15088.5, subd. (b).)

b.      Mitigation measure 12-2

Sierra Watch asserts the County erred by not reconsidering the efficacy of mitigation measure 12-2 in light of the final EIR's new climate analysis. Because we have concluded the final EIR did not disclose new impacts, its analysis did not of itself require the County to reconsider the efficacy of the mitigation measure.

Sierra Watch also attacks the mitigation measure as it was revised in the final EIR. As written, the measure requires a developer to mitigate impacts if the project conflicts with greenhouse gas targets adopted by the state where those targets, in compliance with the rule of *Newhall Ranch*, are based on "a substantiated linkage" between the project and statewide emission reduction goals. No such targets exist. The final EIR does not discuss how the mitigation measure will apply if no such targets are developed.

57

Sierra Watch claims this approach violates CEQA because the measure does not guarantee that impacts will be mitigated. It requires mitigation only if the project conflicts with emissions targets adopted by the state that are based on a substantiated linkage between the project and the statewide reduction target. Such targets do not exist, and they may not be adopted. The project thus will not trigger the mitigation measure despite its significant emissions impacts.

Sierra Watch also argues that waiting to formulate and impose the mitigation measure until or if such targets are developed violates CEQA by wrongfully deferring mitigation. When it commented on the draft EIR, Sierra Watch raised other mitigation measures it thought were feasible, but the County assertedly did not analyze or adopt them. As a result of these errors, the final EIR does not effectively mitigate the impact.

In its appeal, the Committee raises similar arguments. It claims substantial evidence does not show that mitigation has been required for the project because whether the mitigation measure will apply depends on the future adoption of state targets and linkages with the project that satisfy *Newhall*, targets that may not ever by adopted. By depending on the unknown future formulation of a regulatory standard, the measure lacks a performance standard and wrongfully defers its formulation.

The Committee also claims the measure wrongfully imposes on the applicants the responsibility for determining whether a project's impacts will be significant and allows the developer when submitting a future application for a subdivision map to re-open the significance determination that was made when the project was first approved.

The County acknowledged in the final EIR that no such targets existed and that they may not be able to be established as there were no mechanisms available to determine whether a single project's emissions efficiency fit within the Scoping Plan's targets. However, the final EIR stated that the Air Board was updating its Scoping Plan and that new emissions targets would likely be adopted during the project's 20-year buildout. The County designed the mitigation measure recognizing this fact but without

58

speculating about what those future targets might be. The County argues that it nonetheless committed to mitigating the project's greenhouse gas impacts to the extent it could. It claims that under the circumstances, it did not violate CEQA by building flexibility into the mitigation measure.

As for Sierra Watch's proposed mitigation measures, the County found that most of them were not feasible. They also were not considerably different from others the County had analyzed and found would not clearly lessen the project's emissions impacts. The County claims it acted within its discretion in reaching its conclusion.

Responding to the Committee, the County claims the mitigation measure will apply to all map applications regardless of timing and whether or not the state has adopted new targets or regulations. The measure also does not defer the formulation of mitigation measures; it lists the alternatives to be considered, analyzed, and possibly incorporated into the mitigation plan. Also, the County, and not the applicants, will determine whether the map is consistent with applicable targets and regulations and what additional steps must be taken.

The Guidelines describe acceptable mitigation measures for greenhouse gas emissions. "[L]lead agencies shall consider feasible means, supported by substantial evidence and subject to monitoring or reporting, of mitigating the significant effects of greenhouse gas emissions. Measures to mitigate the significant effects of greenhouse gas emissions may include, among others:

"(1) Measures in an existing plan or mitigation program for the reduction of emissions that are required as part of the lead agency's decision;

"(2) Reductions in emissions resulting from a project through implementation of project features, project design, or other measures . . .;

"(3) Off-site measures, including offsets that are not otherwise required, to mitigate a project's emissions;

"(4) Measures that sequester greenhouse gases;

"(5) In the case of the adoption of a plan, such as a general plan, long range development plan, or plans for the reduction of greenhouse gas emissions, mitigation may include the identification of specific measures that may be implemented on a project-by-project basis.  Mitigation may also include the incorporation of specific measures or policies found in an adopted ordinance or regulation that reduces the cumulative effect of emissions."  (Guidelines, § 15126.4, subd. (c).)

Generally, courts uphold mitigation measures against attacks based on their alleged inadequacy where substantial evidence supports the approving agency's conclusion that the measure will be effective.  (*Sacramento Old City Assn. v. City Council* (1992) 229 Cal.App.3d 1011, 1027.)  However, we will not defer to the agency's determination where the measure's efficacy is not apparent and there is no evidence in the record showing it will be effective in remedying the identified environmental impact.  (See *Sierra Club v. County of San Diego* (2014) 231 Cal.App.4th 1152, 1167-1170 [county violated CEQA by adopting a climate action plan that did not ensure greenhouse gas emission requirements would be met as mitigation measure required it to do].)

Mitigation measure 12-2 is unique.  It provides both a threshold for determining the significance of emissions impacts that will be caused by actual development of the project, and it provides a mitigation measure for impacts found to be significant.  The CEQA violation occurs in the threshold.

Under the mitigation measure, a map's impacts will be deemed to be not significant and no mitigation will be required if operation of the map's project meets or exceeds greenhouse gas emissions targets adopted by the state or County.  But not just any adopted targets.  As written, the mitigation measure requires the project to meet adopted targets that are "based on a substantiated linkage between the project (or Placer County projects in general if a countywide qualified GHG reduction plan is approved) and statewide GHG reduction goals."  In other words, the project must meet adopted state or county targets that, in compliance with *Newhall Ranch*, are based on a relation

60

between the adopted statewide emissions reduction target and the percentage of reduction that would or should be required from the individual project.

The County admitted that no such target or plan exists. Indeed, it went further than that. It stated in the final EIR, "There are no current mechanisms available to determine the level of GHG-efficiency needed on a single project in order to determine if it fits within the Scoping Plan targets," and that such linked targets may never exist. As presently written, however, the mitigation measure operates *only* under targets that are based on those mechanisms and establish the required linkage. If the required targets do not exist, then the mitigation measure's threshold of significance cannot be triggered and the significance of a project's impacts will not be determined. The mitigation measure provides the sole method to determine the impact's significance, as it stated the projects will be required to operate within the existing target "as explained below," referring to the threshold of significance based on targets that satisfy *Newhall Ranch*.

As a result, the mitigation measure defers determining the significance of the impact and establishing appropriate mitigation to an undisclosed time in the future. "Formulation of mitigation measures shall not be deferred until some future time" subject to an exception. (Guidelines, § 15126.4, subd. (a)(1)(B).) Under that exception, the specific details of a mitigation measure may be developed after project approval "when it is impractical or infeasible to include those details during the project's environmental review provided that the agency (1) commits itself to the mitigation, (2) adopts specific performance standards the mitigation will achieve, and (3) identifies the type(s) of potential action(s) that can feasibly achieve that performance standard and that will [be] considered, analyzed, and potentially incorporated in the mitigation measure." (Guidelines, § 15126.4, subd. (a)(1)(B).)

Mitigation measure 12-2 makes a good-faith effort to satisfy the elements necessary to defer development of its specific details, but by relying on performance standards that do not exist and may never exist, the measure defers the determination of

61

the impact's significance to an unknown time and does not sufficiently commit the County and the project applicants to mitigating the impact.

The County contends the mitigation measure is enforceable because it will apply to all maps submitted under the specific plan regardless of timing. That may be so, but as written, the mitigation measure is conditional, and there is no indication the predicate condition will ever be satisfied to trigger mitigation requirements.

The County asserts that the mitigation measure does not depend on new targets or regulations; the County must perform the project-level analysis regardless of the targets and regulations then in place. That is not what the mitigation measure says. The applicant must demonstrate compliance not with just any target and regulation in place, but with a target that satisfies *Newhall Ranch*. The mitigation measure and the EIR are silent on whether or how to mitigate emissions impacts if the required targets are not adopted.

The County points to the list of reduction measures the EIR considers to be feasible that will reduce emissions impacts. What the County ignores is that nothing in the mitigation measure obligates the County to require a project to implement those measures unless the project does not meet the required but non-existent targets. The entire measure is conditioned on the existence of targets that satisfy *Newhall Ranch's* linkage requirement. The County claims it will apply the mitigation measure whether or not such a target has been adopted, but, as the measure is currently written, there is nothing to apply if a target is not adopted. For these reasons, the mitigation measure does not comply with CEQA, and substantial evidence does not support a contrary finding by the County. Imposing a mitigation measure that will not mitigate the impact contravenes CEQA and is prejudicial error.

Because we find the mitigation measure invalid on the grounds stated, we need not address the parties' other challenges to the measure.

III

*The Timberland Productivity Act*

Sierra Watch contends that the County's immediate rezoning of the West Parcel from TPZ (Timberland Production Zone) to zoning that would permit the proposed development violated the Timberland Productivity Act (Gov. Code, § 51100 et seq.). Sierra Watch claims that in approving the rezoning, the County did not make findings required by the statute. Instead, the County adopted findings that purported to justify the immediate rezoning on unrelated grounds.

We disagree. The County adopted the required findings, and those findings were supported by substantial evidence.

A.    Legal and factual background

Section 3(j) of Article XIII of the California Constitution (Article XIII, section 3(j)) authorizes the Legislature to tax timber using a tax system which is not based on property valuation. The provision requires the alternative tax system to "encourage the continued use of timberlands for the production of trees for timber products, and shall provide for restricting the use of timberland to the production of timber products and compatible uses with provisions for taxation of timberland based on the restrictions." (Cal. Const., Art. XIII, § 3(j).)

Pursuant to Article XIII, section 3(j), the Legislature adopted an alternative taxing system for timber and timberland. The Legislature "enacted the Forest Taxation Reform Act of 1976[,] a comprehensive revision of the prior system of taxing timber and timberland. [(Stats. 1976, ch. 176, p. 293.)] Basically, growing timber is exempt from ad valorem property taxes and, instead, the legislature has imposed a yield tax on timber harvested on either public or private land. The underlying timberland is not itself exempt, but provision is made for zoning such land for a minimum period of 10 years as timberland preserve and it is then valued for property tax purposes on the basis of its use

63

for growing and harvesting timber only." (Flavin, Taxing Cal. Property (4th ed. 2020), § 10:6, fns. omitted.)

The section of the Forest Taxation Reform Act dealing with timberland zoning was amended and renamed the California Timberland Productivity Act of 1982 (the Act). (Gov. Code, § 51100.) The Legislature declared the Act was to implement the following state polices: "(1) Maintain the optimum amount of the limited supply of timberland to ensure its current and continued availability for the growing and harvesting of timber and compatible uses. (2) Discourage premature or unnecessary conversion of timberland to urban and other uses. (3) Discourage expansion of urban services into timberland. (4) Encourage investment in timberlands based on reasonable expectation of harvest." (Gov. Code, § 51102, subd. (a); see also Gov. Code, § 51101.)

"The [Act] restricts land in certain timberland production zones (TPZ's) to the growing and harvesting of timber and compatible uses. (See Gov. Code, §§ 51115, 51118.) In exchange, owners of land in a TPZ benefit by lower property tax valuations that reflect the enforceable statutory restrictions." (*Big Creek Lumber Co. v. County of Santa Cruz* (2006) 38 Cal.4th 1139, 1148.)

The Act is similar to the Williamson Act, which "establishes a mechanism for saving agricultural land by allowing counties to create agricultural preserves and then to enter into contracts with landowners within those preserves. (Gov. Code, § 51200 et seq.) A Williamson Act contract obligates the landowner to maintain the land as agricultural for 10 or more years, with resulting tax benefits. (*Id*., §§ 51240–51244.)" (*Save Panoche Valley v. San Benito County* (2013) 217 Cal.App.4th 503, 515-516.)

Landowners who desire their timberland to be rezoned from TPZ and freed from the Act's use restrictions may request a rezoning. If the local governing agency approves the rezoning, it specifies a new zoning which will become effective 10 years from the date of approval. Property taxes will escalate during the 10-year period. (Gov. Code, § 51120.)

However, under certain circumstances, the landowner may request that the property be rezoned immediately.  (Gov. Code, §§ 51130, 51131.)  That is what happened here.  The Act allows timberland to be rezoned immediately "only when the continued use of land in the timberland production zone is neither necessary nor desirable to accomplish the purposes of Section 3(j) of Article XIII of the Constitution and of this chapter [the Act]."  (Gov. Code, § 51130.)

Where converting timberland to another use also requires a timberland conversion permit from the State Board of Forestry and Fire Protection (Cal Fire), as it did here, the procedure for immediate rezoning involves two steps.  (Gov. Code, § 51133.)  First, after the landowner requests that the land be rezoned immediately, the governing local agency (in this case the County) may tentatively approve the request after a public hearing and by a four-fifths vote of the full board of supervisors.  The board must make written findings declaring that immediate rezoning is not inconsistent with the purposes of Article XIII, section 3(j) and the Act, and that the immediate rezoning is in the public interest.  (Gov. Code, § 51333, subd. (a).)

Second, if the County tentatively approves the immediate rezoning, it forwards its approval to Cal Fire for final approval.  (Gov. Code, § 51333, subd. (b).)  If Cal Fire approves a timberland conversion permit for the project, it also gives final approval to the immediate rezoning.  (Gov. Code, § 51133, subd. (b).)  It then notifies the County of its approval, and the County removes the property from the TPZ zone.  (Gov. Code, § 51133, subd. (b).)

Upon immediately rezoning a parcel from TPZ, the County will impose a tax recoupment fee based on a reassessment of the property's value in its rezoned use.  (Gov. Code, § 51142.)

Here, the County tentatively approved the immediate rezoning as part of approving the project.  It rezoned 662 acres of the West Parcel from TPZ to "Specific Plan – Martis Valley West."  The rest of the West Parcel, 390 acres, remained in TPZ.

The County also rezoned 670 acres of the East Parcel from single-family residential and commercial uses to TPZ. The rest of the East Parcel, 5,706 acres, remained in TPZ.

The County made additional findings in addition to those required under Government Code section 51133 for a rezoning that must be approved by Cal Fire. (See Gov. Code, § 51134.) Its findings included the two findings required under Government Code section 51133: (1) the immediate rezoning would be in the public interest; and (2) the rezoning was not inconsistent with the purposes of article XIII, section 3(j).

B.     Discussion

Generally, the adoption of a zoning ordinance is a legislative act. (*Arnel Development Co. v. City of Costa Mesa* (1980) 28 Cal.3d 511, 514.) Judicial review of legislative action is limited to determining whether the enactment is arbitrary, capricious, or unconstitutional. (*Lockard v. City of Los Angeles* (1949) 33 Cal.2d 453, 461-462.)

However, an immediate rezoning under the Act is a quasi-adjudicative act. (See *Sierra Club v. City of Hayward* (1981) 28 Cal.3d 840, 849 (*City of Hayward*) [cancellation of Williamson Act contract is adjudicative act].) Similar to the Williamson Act, the Act required the County to hold a public hearing on the issue and exercise its discretion in weighing the evidence and making findings particular to the specific property before it. Our review, therefore, is to determine whether the County followed the required procedure and whether substantial evidence supports the County's required findings. (*Ibid.*; see Code Civ. Proc., § 1094.5.)

Sierra Watch contends the County did not make a required finding that " 'the continued use of land in the timber production zone is neither necessary nor desirable.' (Gov. Code, § 51130.)" Sierra Watch asserts the County was required to make this determination but did not, nor could it because the West Parcel land is a productive forest. Instead, according to Sierra Watch, the County adopted a series of unlawful findings that purported to justify the immediate rezoning on "other, unrelated grounds."

66

In making its assertion, Sierra Watch omits a crucial part of the statute it quotes. The complete sentence reads: "The purpose of this article [the article authorizing immediate rezoning] is to provide relief from zoning as timberland production pursuant to [the Act] only when the continued use of land in the timberland production zone is neither necessary nor desirable *to accomplish the purposes of Section 3(j) of Article XIII of the Constitution and of [the Act]*." (Gov. Code, § 51130, italics added.)

The Act goes on to require the County, before approving an immediate rezoning, to make written findings "that immediate rezoning is not inconsistent with the purposes of subdivision (j) of Section 3 of Article XIII of the California Constitution and of [the Act]," and that the immediate rezoning is in the public interest. (Gov. Code, § 51133, subd. (a)(2), (3).) These findings, which the County made, are not materially different from determining that continuing the timberland use is neither necessary nor desirable to accomplish the purposes of Article XIII, section 3(j) and the Act. Thus, the County made the determinations required by the Act. The issue before us is whether substantial evidence supports the County's findings. (See *Save Panoche Valley v. San Benito County, supra*, 217 Cal.App.4th at pp. 516-517 [where county cancelled Williamson Act contract based on the public interest, review is limited to whether substantial evidence supports that finding].)

To support its findings, the County relied upon the following evidence. It found the rezoning was not inconsistent with the purposes of Article XIII, section 3(j) and the Act because "placing 670 acres of the East Parcel back into TPZ would create a contiguous 6,376 acre expanse of TPZ lands devoted entirely to forest management and related compatible uses. The extensive spatial arrangement of the East Parcel supports an increased economy of scale in regard to forest management on the subject timberlands. The balance of enhancing the TPZ lands within the East Parcel, while providing for residential demands of the area within the West Parcel, is the result of lengthy and

67

deliberate consideration, design, and mitigation that is neither premature nor unnecessary in nature."

The County found that the immediate rezoning was in the public interest because "the withdrawal of the West Parcel from TPZ would provide both environmental and economic benefits for the public. The rezone of the West Parcel would allow for the East Parcel to be placed back into TPZ which would result in an eight (8) acre increase in lands zoned TPZ in the Martis Valley. This action would create 6,376 acres east of Highway 267 that would be preserved, which is nearly 25% of the total acreage in Martis Valley. Further, placement of the East Parcel back into TPZ will retire 600 residential units, thereby reducing the overall residential density of the area, and providing increased spatial continuity of the preserved lands within the East Parcel. The rezone of the West Parcel will also provide benefit to the local tax base through increased property and business tax revenue generated within the new development."

This evidence and other evidence in the record constitute substantial evidence in support of the County's findings that the immediate rezoning was not inconsistent with the purposes of Article XIII, section 3(j) and the Act and that it was in the public interest. With the immediate rezoning, the public not only maintains the amount of protected timberland, it increases it. By rezoning 662 acres of the West Parcel for development and rezoning 670 acres of the East Parcel as TPZ, the County actually increases the amount of existing timberland that will be zoned TPZ. The project and the rezoning will also discourage unnecessary conversion of timberland by requiring the East Parcel to be sold to a land trust or to become subject to a conservation easement restricting the East Parcel's use, thereby preserving the entire East Parcel as forest and open space.

Other evidence in the record supports the County's findings. A registered professional forester concluded that "[w]hen considered with the East Parcel zoning, the application for immediate rezone for the West Parcel is not inconsistent with" the purposes of Article XIII, section 3(j) and the Act. The EIR stated that the rezoning would

68

connect an estimated 50,000 acres of open space and forest lands east of State Route 267. Timber harvesting plans would be submitted to Cal Fire for any tree harvesting done on the West Parcel for the project.

Sierra Watch nonetheless claims the findings are unlawful under the Act for four reasons: (1) the County did not justify deviating from the normal, 10-year waiting period in its findings; (2) the County erred by relying on rezoning East Parcel land to TPZ to justify rezoning West Parcel land out of TPZ; (3) no evidence supports the finding that the rezoning would address residential demands in the area; and (4) the finding that the rezoning was in the public interest because it would increase tax revenue was legally unavailable.

### 1.    Lack of additional findings

Sierra Watch argues that the County's findings did not comply with the Act because the County cited no evidence that "following the ten-year rollout for TPZ rezoning would not serve the 'purposes that purport to justify cancellation': the development of a second-home subdivision." The Act does not require an agency to make that finding. Nevertheless, Sierra Watch claims that the California Supreme Court's imposition of that requirement in *City of Hayward* on the cancellation of Williamson Act contracts under a former version of that statute also applies to immediate rezoning under the Act. We must explain the Williamson Act and *City of Hayward* in some detail in order to address this argument.

Formally known as the California Land Conservation Act of 1965 (Gov. Code, § 51200 et seq.), the Williamson Act sought to conserve agricultural lands and to discourage their premature development into urban uses. To do that, the Williamson Act authorizes owners of agricultural lands to enter into contracts that restrict the land to agricultural and open space use for at least 10 years. In return, the property is assessed for tax purposes based only on its open space use and unaffected by its development

69

potential. (*City of Hayward, supra*, 28 Cal.3d at pp. 850-851.) A landowner could terminate the contract at any time, but the land's use was restricted for 10 years from the notice of termination. This was to deny the tax benefits to short term speculators and developers. (*Id*. at p. 852.)

The Williamson Act authorizes immediate cancellation of the contract. At the time of the *City of Hayward* ruling, the Williamson Act allowed for cancellation " 'only when the continued dedication of land under such contracts to agricultural use is neither necessary nor desirable for the purposes of (the act).' " (*City of Hayward, supra*, 28 Cal.3d at p. 852, quoting former Gov. Code, § 51280 [Stats. 1965, ch. 1443, § 1].) The governing agency could approve the cancellation only upon finding the cancellation was "not inconsistent with the purposes" of the Williamson Act and was in the public interest. (Former Gov. Code, § 51282 [Stats. 1978, ch. 1120, § 11].)

Reviewing an immediate cancellation of a contract, the California Supreme Court in *City of Hayward* concluded the evidence was insufficient to sustain "the ultimate determination of consistency with the purposes of the act." (*City of Hayward, supra*, 28 Cal.3d at p. 854.) The court stated that the 10-year nonrenewal process was the intended and general vehicle for contract termination. The cancellation procedure was included as " 'a means of dealing with strictly emergency situations where the public interest no longer dictates that the contract be continued[.]' [Citation.]" (*Id*. at p. 852.) The nonrenewal process was the preferred termination method, and cancellation was "impermissible 'except upon extremely stringent conditions.' [Citation.]" (*Id*. at p. 853.) If cancellation was easily available, "the act would simply function as a tax shelter for real estate speculators." (*Ibid*.)

The Supreme Court held that in order to show the cancellation was not inconsistent with the purposes of the Act, "there must be substantial evidence that awaiting the normal termination of the contract would fail to serve the purposes that purport to justify cancellation." (*City of Hayward, supra*, 28 Cal.3d at p. 854.) The court

70

also held that "cancellation is inconsistent with the purposes of the [Williamson Act] if the objectives to be served by cancellation should have been predicted and served by nonrenewal at an earlier time, or if such objectives can be served by nonrenewal now." (*Id*. at p. 855.)

Had the story ended there, one could argue as Sierra Watch does here that because the Act requires the same findings as the Williamson Act did for immediate rezoning or cancellation, *City of Hayward's* interpretation of the additional findings required under the Williamson Act also applies to the Act. The Legislature, however, reacted swiftly to the *City of Hayward* decision. It adopted a number of amendments to the Williamson Act to limit, and in some instances reverse, *City of Hayward's* reach. It declared that the purpose of the amendments "is not to weaken or strengthen the Williamson Act but simply to clarify and make the law workable in light of problems and ambiguities created by the California Supreme Court decision in the case of *Sierra Club v. City of Hayward*, 28 Cal.3d 840." (Stats. 1981, ch. 1095, § 8.)

The amendments eliminated the additional findings the Supreme Court had imposed and which Sierra Watch seeks to impose here. The Legislature expressly defined in Government Code section 51282 the types of evidentiary findings the governing agency had to make to declare a cancellation was consistent with the Williamson Act's purposes and was in the public interest. (Gov. Code, § 51282, subds. (b), (c) [Stats. 1981, ch. 1095, § 2].) The amended statute stated that the approving agency "shall not be required to make any findings other than or in addition to those expressly set forth" in Government Code section 51282 or in CEQA. (Gov. Code, § 51282, subd. (f).) Of relevance here, none of the mandatory findings require an agency approving a cancellation to show that not renewing the contract and waiting 10 years would fail to serve the purposes of the cancellation, or that the objectives to be served could not have been predicted 10 years earlier.

71

"The law is well established that although construction of a statute is a judicial function, where a statute is unclear, a subsequent expression of the Legislature bearing upon the intent of the prior statute may be properly considered in determining the effect and meaning of the prior statute." (*Tyler v. State of California* (1982) 134 Cal.App.3d 973, 977.) By declaring that the amendments enacted in response to *City of Hayward* were neither to weaken nor strengthen the Williamson Act but were simply to clarify the law, the Legislature indicated its understanding that the correct meaning of the law, except as expressly changed by the amendments, had always been the same, and that an intervening judicial interpretation had imposed an aberrant interpretation of legislative intent. (See *id*. at pp. 976-977.)

In other words, the Legislature never intended to require agencies, when determining whether a cancellation of a Williamson Act contract is consistent with the statute and is in the public interest, to also find that waiting 10 years would fail to serve the purposes of the cancellation or that the objectives to be served could not have been predicted 10 years earlier. (See *Friends of East Willits Valley v. County of Mendocino* (2002) 101 Cal.App.4th 191, 204-205 [after 1981 amendments, *City of Hayward's* requirement to find an emergency situation exists no longer applies].) As a result, *City of Hayward* has lost its precedential value on this issue, and, accordingly, has no precedential value in interpreting the same language in the Act, especially when, as here, no other evidence in the Act or the record indicates such additional findings should be required. We do not apply the case here.

### 2. Reliance on rezoning East Parcel to TPZ

Sierra Watch contends that the County's reliance on the addition of TPZ land to the East Parcel as a basis for its findings contravened the plain language of the Act. It argues the Act required the County to focus only on the land being rezoned in the West Parcel, Sierra Watch asserts, because "the Act authorizes immediate rezoning 'only when

the continued use of *land in the [TPZ]* is neither necessary nor desirable.'  (Gov. Code, § 51130, (emphasis added).)"  Again, Sierra Watch ignores the full statute.

The Act authorized the County to approve the rezoning of the West Parcel if the County found that continuing that land as TPZ was neither necessary nor desirable to accomplish the purposes of Article XIII, section 3(j) and the Act.  (Gov. Code, § 51130.)  Determining whether continuing the land as TPZ is neither necessary nor desirable to accomplish the Act's purposes will depend in large part on the parcel's relation to surrounding lands and land uses and the contextual circumstances.  This case proves why that is so.  If the County had denied the rezoning merely because it took 662 acres of the West Parcel out of the TPZ, the County would not have recognized that the concomitant rezoning of the East Parcel satisfied the Act's policy of maintaining the optimum amount of timberland.  Denying the rezoning would have left 670 acres of East Parcel forestland zoned for the development of over 1,200 dwelling units, and the optimum amount of timberland in this circumstance would not have been maintained.  The Act did not prohibit the County from analyzing the proposed rezoning's compliance with the policies of the Act and Article XIII, section 3(j) in that broader view.

Sierra Watch argues that we cannot interpret the Act in this manner because the Legislature, according to *City of Hayward*, intended to make immediate rezoning "exceedingly rare," and allowing the County to rezone the West Parcel based on rezoning a different parcel would create a loophole to allow landowners to remove land from the TPZ immediately merely by locating another parcel to replace it.  We have already determined that *City of Hayward* is not relevant to interpreting the Legislature's intent on this issue.  And the location of another parcel by itself will not satisfy the requirements of the Act.

We find the Legislature's intent from the language the Legislature adopted, including the language Sierra Watch continues to ignore.  The Legislature stated its intent was to maintain the optimum amount of timberland and that an immediate rezoning could

73

occur only when maintaining land as TPZ was neither necessary nor desirable to accomplish the purposes of Article XIII, section 3(j) and the Act. If the County found that circumstance to exist here, and substantial evidence supports its findings, our analysis is finished, no matter how common or rare the occurrence.

### 3. Evidence of residential demand

Sierra Watch contends that no evidence in the record supports the County's statement that the rezoning "would address 'residential demands of the area.' " The project is a second-home resort community with less than 20 percent of the homes projected to be occupied full time. And the vacancy rate for homes in the area was 51 percent in 2010.

The evidence, however, indicates the project would meet a particular residential demand in the area—affordable employee housing. The County's justification for its finding appears in this sentence: "The balance of enhancing the TPZ lands within the East Parcel, while providing for residential demands of the area within the West Parcel, is the result of lengthy and deliberate consideration, design, and mitigation that is neither premature nor unnecessary in nature." A development agreement approved by the board of supervisors required the project to include employee housing for 47 full time equivalent employees and to pay an in lieu fee for additional employee housing. Even Sierra Watch acknowledged that affordable housing was in short supply in the area. The County's finding that the project would meet residential demand is supported by substantial evidence.

### 4. Evidence of tax benefit to support the findings

Sierra Watch contends that the County's findings under the Act were unlawful because the County stated the rezoning benefited the public interest by increasing property and business tax revenue. Sierra Watch claims that this finding is legally unavailable. *City of Hayward* stated that "[a]ny decision to cancel land preservation

74

contracts must . . . analyze the interest of the public as a whole in the value of the land for open space and agricultural use. Of course, the interests of the local and regional communities are also important, but no decision regarding the public interest can be based exclusively on their parochialism." (*City of Hayward, supra*, 28 Cal.3d at p. 856.) Sierra Watch asserts that because the County considered "only the local community and its tax base—and not the state's interest in preserving valuable timberland—its finding is invalid as a matter of law."

The County did not find the rezoning was in the public interest solely based on the local community and its tax base. It found the rezoning was in the public interest because it would provide "both environmental and economic benefits for the public." Those benefits allow for an increase in the amount of total preserved timberland by eight acres and the protection of 6,376 contiguous acres as timberland and some 50,000 contiguous acres as open space. It would also reduce the number of developable residential units in the area by 600 units. The County's findings are not based solely on parochial economic interests.

Sierra Watch's objections to the County's findings under the Act are without merit. We uphold the County's findings based on the substantial evidence that supports them.

COUNTY AND APPLICANTS' CROSS APPEAL

(C087102)

In their appeal, the County and applicants contend the trial court erred when it found that the EIR did not adequately address, and that substantial evidence did not support, its conclusion that the project's impacts on emergency response and evacuation plans would be less than significant. We agree with the County and applicants.

75

A.    Background

The project's West Parcel is located in what Cal Fire has designated a "Very High" risk fire hazard severity zone.  That zone consists of wildland areas that support high to extreme fire behavior.  Cal Fire currently provides fire protection services to the site.  If the project is approved, the West Parcel development area will be annexed into the Northstar Community Services District, which will provide fire protection services for the site through the Northstar Fire Department.

The County has established an evacuation plan for the area.  This plan, known as the Placer Operational Area East Side Emergency Evacuation Plan, was developed to increase preparedness and facilitate an efficient and rapid evacuation of threatened communities in the event of an emergency such as a forest fire or flood.  The plan coordinates and assigns responsibilities to federal, state, and local authorities for organizing and conducting an evacuation.

The county evacuation plan designates Interstate 80 and state routes 267, 89, and 28 as the major evacuation routes in the area.  In an emergency, the unified command will designate which of those routes will be used for evacuation and which for emergency vehicle ingress and egress.  When necessary, surface streets may also be designated for both uses.  The California Highway Patrol will be primarily responsible for traffic control during an evacuation.

To determine whether the project would significantly interfere with the county evacuation plan, the EIR relied on the Guidelines' Appendix G checklist to provide a standard of significance.  Under that standard, the project's impact would be significant if the project would "impair implementation or physically interfere with an adopted emergency response plan or emergency evacuation plan[.]"

The draft EIR concluded that any interference the project may cause with an emergency evacuation plan would be less than significant.  One reason was the project

would provide emergency vehicle access. In addition to the main entrance, the project would have two emergency vehicle access routes from route 267 to the West Parcel's development area. Both would provide access only for emergency vehicles unless they were needed to evacuate residents.

The draft EIR relied on other reasons. At the project's build-out, vehicle trips generated by the project would represent an incremental increase over existing traffic volumes. However, the increase would be insufficient to interfere with the use of route 267 under the county evacuation plan. The project would not cut off or otherwise modify any existing evacuation routes.

Also, the project would develop a fire protection plan that would include a project emergency and evacuation plan. Referred to as the project Emergency Preparedness and Evacuation Plan, the project emergency plan states that all project evacuation procedures will be conducted according to the County's evacuation plan and Northstar Fire Department procedures. In addition to designating the site's two emergency vehicle access routes, the project emergency plan designates secondary emergency access roads inside the project area that will connect cul-de-sacs and dead end streets so that every parcel has two routes for ingress and egress during an emergency. Signs identifying the emergency access routes will be posted.

The project emergency plan states that in the unlikely event where time necessary for evacuation is insufficient, it may be safer to shelter-in-place rather than evacuate. The plan requires the project's CC&Rs to include a requirement that the homeowners association, prior to construction of the 200th unit, design and construct an amenity to serve as a shelter-in-place location. Where shelter-in-place is required, this amenity would be open to project residents and to the public.

The draft EIR also concluded that the project's contribution to the cumulative impact on implementation of the county evacuation plan was not cumulatively considerable. Evacuation from other nearby projects would occur via local roads to route

77

267.  But, "[w]hile conditions on local roadways and SR 267 during an emergency evacuation could be congested, no known element of the proposed project or cumulative projects would prevent or impede evacuation, or result in physical interference with an evacuation plan such that evacuation could not occur."  The project's primary access road and its two emergency vehicle access roads would "provide[] sufficient egress in the event of an emergency evacuation."

Commenters on the draft EIR expressed concern that the project would increase the risk of fire hazards and response times of emergency responders to the project site and area, and that in the event of a wildfire or seismic event that requires evacuation, route 267 would be limited in its capacity to support evacuation in a timely manner.

In a master response in the final EIR, the County elaborated on the project's emergency plan.  In addition to complementing the County's evacuation plan, the emergency plan would enforce the various laws and regulations that will apply to the development to reduce the risk of wildfire.  Those fire prevention regulations and measures impose defensible space, fuel maintenance, structural and infrastructure requirements, and building code requirements.  The project emergency plan would also impose requirements for water supply and flow, emergency access, evacuation signage, public education and communication, forestry management, measures to address onsite hazards, and development restrictions.

The final EIR also discussed a study undertaken to analyze the potential impact. The County's transportation consultants, LSC Transportation Consultants, modeled how long it would take for the West Parcel development to evacuate in the event of a wildfire using route 267 and evacuating north to the Truckee airport during the peak of the summer tourist season.  Conservatively assuming that all of the project's residences would be occupied and evacuated (935 vehicles), and that peak traffic would already exist on the highway, the consultants estimated based on route 267's capacity from the site north to the Truckee Airport that it would take approximately 1.3 hours for all

78

vehicles to exit the project site under existing-plus-project conditions, and 1.5 hours under cumulative-plus-project conditions. The estimate for the cumulative condition assumed that intersection improvements to route 267 planned in the County's capital improvement program had been implemented but route 267 had not been widened from two lanes to four lanes, as has been planned.

The final EIR stated "the proposed project, or any project that adds people to an area, would increase the amount of time to complete an evacuation." But it then stated "this does not necessarily generate a safety risk. Emergency personnel who issue an evacuation order take into account the time needed to implement an evacuation when determining when and where to issue evacuation orders. For events like wildfires, the fires are tracked from the moment of discovery, and risk to nearby development is assessed on a regular basis. Hours or days of lead time could be available to assess risk and make evacuation determinations. During these periods, peak occupancy conditions typically do not occur as drifting smoke, awareness of the risk, or other factors result in people avoiding the area." From this additional analysis, the final EIR concluded that the project's impact on emergency evacuation plans would be less than significant.

The trial court concluded that substantial evidence did not support the EIR's significance finding and that the EIR's analysis was incomplete. It stated, "The EIR identifies the area as a very high fire hazard severity zone but then fails to present a sufficient analysis to address the impacts of the project on emergency evacuation procedures. The EIR lacks a meaningful discussion on this issue, relying more on conclusions rather than facts. Even when considering the LSC Transportation Consultants memorandum . . . the analysis is lacking. The memorandum fails to present sufficient discussion that integrates into the overall analysis to support the EIR's conclusions. Simply put, the EIR, even when read in conjunction with LSC's memorandum, fails to adequately address the Project's impacts on emergency evacuations in the area – especially in light of its high fire hazard status – so as to leave

79

the analysis incomplete and failing to properly disclose to the public the actual impacts of the Project."

B.     Discussion

The County claims the EIR adequately discussed the potential impact and that substantial evidence supports its determination of no significant impact. Sierra Watch disagrees and asserts the EIR did not meaningfully analyze compliance with the standard of significance and did not satisfy CEQA on numerous grounds.

CEQA requires an EIR to analyze "any significant environmental effects the project might cause or risk exacerbating by bringing development and people into the area affected. For example the EIR should evaluate any potentially significant direct, indirect, or cumulative environmental impacts of locating development in areas susceptible to hazardous conditions (e.g., . . . wildfire risk areas), including both short-term and long-term conditions . . . ." (Guidelines, § 15126.2, subd. (a).) "[W]hen a proposed project risks exacerbating those environmental hazards or conditions that already exist, an agency must analyze the potential impact of such hazards on future residents or users. In those specific instances, it is the project's impact on the environment—and not the environment's impact on the project—that compels an evaluation of how future residents or users could be affected by exacerbated conditions." (*California Building Industry Assn. v. Bay Area Air Quality Management Dist., supra*, 62 Cal.4th at pp. 377-378, italics omitted.)

Developing new homes and stores in a very high fire hazard area risks exacerbating the hazard by putting more people and property in harm's way and increasing the chance of a wildfire starting. The development increases the number of people who may need to be rescued, rendered aid, and evacuated and the amount of property that may need to be protected. Thus, when we review for whether a project may interfere with implementation of an emergency response and evacuation plan, we are

80

primarily concerned that the public and decisionmakers understand the impact the project will have on the new residents' ability to evacuate and on emergency personnel's ability to protect and service the residents and their property consistent with the adopted plan.

We conclude substantial evidence supports the EIR's conclusion that the project will not significantly impair implementation or physically interfere with an adopted emergency response plan or emergency evacuation plan. The EIR recognized that the project would add people to the area, which would increase the amount of time to complete an evacuation. But it concluded the impact was not significant for a number of reasons.

The project would not interfere with the county evacuation plan's planned operation. The project would not cut off or otherwise modify any of the County's evacuation routes. Nothing in the project itself or other cumulative projects would prevent or interfere with the county evacuation plan such that an evacuation could not occur.

The project would provide two emergency vehicle access routes to the property in addition to the main entrance. This gave the project three routes that could be used for a combination of evacuation and emergency access. And, although not expressly stated in the EIR, one of the emergency access routes connects to an old logging road described in the EIR that could facilitate an evacuation to route 267 or to the west away from route 267. Additionally, the project would include internal secondary emergency access routes so that every parcel had two routes for ingress and egress. The project would eventually provide an amenity that would allow people to shelter in place if they were unable to evacuate the site.

To address the project's impact on the project residents' ability to evacuate, the LSC study provided a reasonable assessment of what may happen if the project had to evacuate on route 267 to the north. Based on the highway's capacity on one of its busiest days, the study found it would take 1.3 hours to evacuate the project site at full capacity

81

and 1.5 hours cumulatively with other projects. In concluding the impact was less than significant, the County implicitly determined that those times were reasonable under the modeled circumstances.

The County directs us to other evidence in the record to support the EIR's conclusion. The project will not significantly affect the Northstar Fire Department's response times. The EIR estimated it would take a crew nine or 10 minutes to respond to a service call from the project site, which met recommended response times for rural areas. The additional population, however, would necessitate additional staffing. The project would pay an impact fee to help fund additional equipment, and it would pay a separate fee under the development agreement to help fund hiring two additional firefighters over time. The County asserts that these measures will improve the fire department's ability as a first-responder to extinguish fires that may start in its jurisdiction and keep them from spreading.

The County also relies on the project's fire prevention standards and requirements that will be imposed on the project to mitigate the residents' exposure to wildfire hazards. The numerous regulations and rules that will regulate how property owners maintain their properties should also reduce the risk and spread of a wildfire. While these measures do not address what will happen once an actual evacuation has begun, they do show the project will take steps to reduce the risks of wildfire and having to evacuate in the first place.

Sierra Watch attacks this evidence on numerous grounds. It criticizes the EIR for not disclosing how much the project would increase evacuation times or why such an increase would not create a safety risk, for not analyzing the time residents would need to evacuate the area once they reach route 267, and for not addressing how emergency response times would be affected by a mass evacuation.

Sierra Watch challenges the final EIR for relying on the project's emergency plan and other fire prevention standards to address the impact. It claims these standards do not

82

address what will happen in an evacuation. Relying on two emergency access routes does not address the issue as both will funnel traffic to and from route 267, which emergency responders and evacuees will use. And the EIR did not discuss using the logging road as an alternate evacuation route.

Sierra Watch asserts the traffic consultants' study does not provide the missing information and the County does not explain how it determined the study's estimated evacuation times were acceptable and not significant. Sierra Watch also argues the study does not address uncontrollable factors such as a fast-moving wildfire, and its assumptions of an orderly evacuation are unsupported and optimistic.

Sierra Watch contests the EIR's conclusion that the project's contribution to evacuation traffic using route 267 will not be significant when the EIR earlier concluded that the project's contribution to route 267 traffic under peak conditions will be significant.

These and other criticisms asserted by Sierra Watch raise the overarching question of how should an EIR address a project's impact on the implementation of evacuation plans. Numerous scenarios could be modeled and discussed; some would show a significant impact and others would not. The responses to many of Sierra Watch's criticisms could change depending on the evacuation scenario being addressed.

The County explained the inherent difficulty of the task in response to a comment on the final EIR. The commenter raised numerous criticisms of the EIR's analysis similar to those raised by Sierra Watch, and the County explained why the EIR's analysis was satisfactory and why a more detailed analysis was not reasonable or required. We quote the response in part:

"The comment suggests that 1.5 hours is a long time in the face of a serious wind driven fire event, and suggests that multiple scenarios should have been evaluated. . . . The comment suggests that the analysis should assess the rate at which fires would advance, considering such variables as wind speeds, direction, humidity and fuel

83

moisture content considerations, topography, time of day, and fuel loadings (including brush). Because of the number of variables involved in the behavior of any given fire event, the number of scenarios that could be defined would be so numerous that selection of any one or several would be speculative and not necessarily representative. The more tangible metric, and a reasonable indication of the effect of the project on emergency evacuation, is the time required for evacuation of the project itself, and the effect of the project on overall evacuation times, as described in the EIR. [¶] . . . [¶]

"The comment also identifies two specific situations that might happen—a family van towing a boat trailer that tips over and blocks the evacuation route, and someone at the end of a queue responding to embers and smoke drifting across the road. These are speculative situations, one of a myriad that cannot meaningfully be incorporated into the quantitative analysis of time needed to evacuate the [project] site."

Courts have made clear that "CEQA does not require evaluation of speculative impacts. (Guidelines, § 15145.)" (*National Parks & Conservation Assn. v. County of Riverside* (1999) 71 Cal.App.4th 1341, 1364.) "Agencies are not required to engage in 'sheer speculation' as to future environmental consequences of the project." (*Chaparral Greens v. City of Chula Vista* (1996) 50 Cal.App.4th 1134, 1145, quoting *Kings County Farm Bureau v. City of Hanford* (1990) 221 Cal.App.3d 692, 738.)

CEQA also does not require an analysis to be exhaustive. It is "not necessary that the analysis be so exhaustively detailed as to include every conceivable study or permutation of the data." (*San Joaquin Raptor Rescue Center v. County of Merced* (2007) 149 Cal.App.4th 645, 666; Guidelines, § 15151.) " ' "[A]n EIR need not include all information available on a subject[;]" . . . [all that is required is] sufficient information and analysis to enable the public to discern the analytic[al] route the agency traveled from evidence to action.' [Citation.] 'A project opponent or reviewing court can always imagine some additional study or analysis that might provide helpful information. . . . That further study . . . might be helpful does not make it necessary.' "

84

(*North Coast Rivers Alliance v. Marin Municipal Water Dist. Bd. of Directors* (2013) 216 Cal.App.4th 614, 639-640.)

These points apply when we consider an EIR's review of a project's potential to disrupt implementation of an evacuation plan. It is difficult to predict how an actual evacuation will unfold and determine how a project may impact it. An evacuation is developed and directed in real time by those conducting it in response to the unique conditions before them. As a member of the County's office of emergency services explained to the planning commission, an evacuation is "always going to be difficult. There's no evacuation that ever goes textbook smooth. It's like running a play in football. You call the play and then you hope things go as best as they can."

Under these circumstances, it is important we remember that a lead agency "has considerable discretion to decide the manner of the discussion of potentially significant effects in an EIR." (*County of Fresno, supra*, 6 Cal.5th at p. 515.) "This would include determinations regarding the methodology for studying an impact, whether a particular method of analysis is reasonably feasible, and whether it would yield information that would be both reliable and informative. [Citations.]" (Kostka & Zischke, *supra*, § 23.34.)

"CEQA requires an EIR to reflect a good faith effort at full disclosure; it does not mandate perfection, nor does it require an analysis to be exhaustive. (Guidelines, § 15151.)" (*Kings County Farm Bureau v. City of Hanford, supra*, 221 Cal.App.3d at p. 712.) "An EIR is required to evaluate a particular environmental impact only to the extent it is 'reasonably feasible' to do so." (*Rialto Citizens for Responsible Growth v. City of Rialto* (2012) 208 Cal.App.4th 899, 937, quoting Guidelines, § 15151.)

The evidence here indicates that the County did not abuse its discretion in determining its methodology for evaluating the impact to its evacuation plan or selecting the standard of significance, and that substantial evidence supports the EIR's conclusion. The EIR's analysis provides a reasonable explanation under modeled circumstances of

how the project will affect its residents' ability to evacuate and emergency responders' ability to access the area and the site.

Regarding Sierra Watch's opposition, many of its criticisms, particularly of the LSC study, seek additional analysis based on different evacuation scenarios which, although possibly helpful, is not necessary in this circumstance. Those concerns are answered by the County's discretion to determine its methodologies for analyzing the impact and the reasonableness of the methodologies the County used.

The EIR's conclusion that the project's traffic would in general significantly impact route 267 traffic but not significantly impact that route in an evacuation is not necessarily inconsistent. Whether a given impact is significant depends on the context. Addressing the same argument raised in *Squaw Valley*, we stated in an unpublished portion of our opinion, "An agency, for example, might find a traffic delay of 2.5 seconds significant in some contexts when considering impacts to traffic conditions (as the County did here), and, without being fatally inconsistent, also find a similar delay insignificant when considering impacts to emergency evacuation plans. Or to put it differently, as the EIR here indicated, an agency might find *time* the sole relevant consideration when evaluating impacts to traffic conditions, but then find *public safety* the guiding consideration when evaluating impacts to emergency evacuation plans. Again, the context matters. And Sierra Watch has not shown the County abused its discretion merely because its thresholds of significance for fire-related impacts were not equivalent to its thresholds of significance for transportation-related impacts." (*Squaw Valley, supra*, 69 Cal.App.5th at p. 104.)

The myriad of possible emergency scenarios could result in an evacuation where project traffic would not adversely affect the highway's level of service. Incident command's designation of evacuation routes and emergency vehicle access routes, as well as law enforcement's control of traffic could also reduce the impact on route 267.

The EIR is not required to analyze the worst-case scenario. (*High Sierra Rural Alliance v. County of Plumas* (2018) 29 Cal.App.5th 102, 126.)

Sierra Watch criticizes the County's reliance on the project's fire prevention measures for mitigating wildfire risk as evidence of mitigating evacuation impacts. While the evidence does not directly address impacts on an actual evacuation, it explains the measures the project is taking to mitigate its impact on an evacuation by reducing the chances of wildfire occurring on its site and the need for an evacuation. Evidence in the record supporting the EIR's analysis indicates that fire prevention measures such as clearing brush and thinning trees significantly decrease the rate at which a wildfire may spread. The evidence is relevant for that purpose.

Sierra Watch asserts the EIR's reliance on the project emergency plan is insufficient because the plan does not address nearby areas, route 267's capacity, or the project's impacts on evacuation, and that its mention of a shelter-in-place amenity is not an adequate substitute for an evacuation plan. The project plan in effect is a supplement to the county evacuation plan. Its purpose was not to address the evacuation of other areas or serve as an environmental review of a project evacuation; it was to ensure the project would evacuate in conformity with the county plan. The project emergency plan did not consider route 267's capacity, but the LSC study did. And the shelter-in-place facility is not proposed as a substitute. It is a contingency if the authorities order residents to shelter in place and not evacuate.

Sierra Watch argues the provision of two emergency access roads does not support the EIR's conclusion because each of these roads funnel to route 267. But without knowing how the authorities will direct the use of route 267 and the project's roads in an actual evacuation, it would be speculative to conclude that just because all roads lead to route 267 the impact is significant. The project will provide three roads for ingress and egress that could be used for evacuation and access, and one of the emergency access routes could provide an alternate evacuation route away from route 267.

Sierra Watch criticizes the County's reliance on the Northstar Fire Department's response times when those were calculated for emergency medical services calls and structure fires, not a wildfire-scale disaster that would impact response times. The project's payment of fees to support hiring additional firefighters has the same fault. But the County's experts concluded the response times were adequate. In addition, first-responder times are relevant, as first responders will be the first ones to arrive at a fire on the site. If the fire spreads, the incident command will dispatch additional firefighters pursuant to mutual aid agreements between various fire agencies in the area. Northstar Fire will not be the only responding agency.

The only reported case to address impacts on evacuation plans, *Clews Land and Livestock, LLC v. City of San Diego* (2017) 19 Cal.App.5th 161 (*Clews Land*), relied on similar factors to determine the impact there was not significant. The facts and scale of that project were very different than here, involving only the potential evacuation of a horse ranch and a proposed school using a common driveway 1,650 feet long. But the area was a very high fire hazard zone. (*Id*. at p. 173.) The court of appeal affirmed the county's determination that the school would not significantly impact the parties' ability to evacuate. It gave three reasons. Complaints about the driveway's inadequacy were speculative. The school would mitigate the possible impact by having an alternate evacuation route along a dirt road, being in session only part of the year, and closing on red flag warning days. And the inherent difficulty of evacuating the ranch already existed and would not be significantly affected by the project. (*Id*. at p. 194.)

Within the methodology chosen by the County, the EIR considered these and other factors to find the impact would be less than significant. The project would not prevent an evacuation using state route 267 or other routes designated in the county evacuation plan. It would mitigate the possible impact by providing two emergency vehicle access routes, one of which could provide an alternate evacuation route. The LSC study addressed route 267's capacity, and it demonstrated the project could evacuate in a

reasonable time under the modeled circumstances. The project further mitigated the impact by providing funding to the first responders for equipment and personnel and by imposing strict fire prevention requirements. We conclude substantial evidence supports the EIR's conclusion that the project's impact on implementation of the county evacuation plan will be less than significant.

THE COMMITTEE'S APPEAL

(C087117)

The Committee raises the following contentions, all under CEQA:

(1) The County violated CEQA by approving measures to mitigate the project's impacts on greenhouse gas emissions that do not comply with CEQA;

(2) The EIR violated CEQA by not adequately describing the environmental setting of forest resources or analyzing the project's cumulative impacts on forest resources;

(3) The EIR violated CEQA by not addressing feasible measures to mitigate the project's impact on traffic;

(4) The EIR violated CEQA by not disclosing the significant impacts that will occur due to the project's contribution to the proposed widening of route 267; and

(5) The EIR violated CEQA by not discussing renewable energy options that were appropriate for the project.

We have already addressed the Committee's contention regarding the EIR's proposed mitigation of greenhouse gas emissions and will not repeat that discussion here. We turn to the Committee's other grounds of appeal.

# I

## *Cumulative Impacts on Forest Resources*

The Committee claims the EIR's analysis of the project's cumulative impacts on forest resources does not comply with CEQA and is not supported by substantial evidence. The Committee asserts the EIR's analysis violated CEQA because (1) its description of the environmental setting did not acknowledge extensive tree mortality in the County caused by drought and bark beetle infestations; (2) the analysis did not address the project's cumulative impact; (3) the analysis did not compare the project to the physical environment; and (4) the analysis did not include the effect of tree loss due to climate change. We conclude the EIR complies with CEQA and substantial evidence supports its analysis.

### A.    Background

The project site and the surrounding area is mostly coniferous forest. The EIR described the forest resources existing on and near the project site. The description was based on peer-reviewed field studies and surveys of the site and its environs performed in 2013, 2014, and 2015.

The EIR determined that 651.5 acres of forest land in the West Parcel would be converted to non-forest, developed uses. This would require removing an estimated 37,723 trees from the West Parcel, an estimated 21,798 of which would have a diameter at breast height of six inches or larger. Approximately 20,000 of those larger trees were white fir. The applicants would have to obtain permits from the County and the state to remove the latter group of trees.

The EIR concluded that the project's impacts on forest lands and timber resources would be less than significant. The estimated loss of 651.5 acres of forest land would not substantially reduce the quantity or quality of these coniferous forest habitats in the region. Most of the larger trees to be removed are white fir. Sierran mixed conifer and

90

white fir forests are common and widely distributed in the region and elsewhere in the Sierra Nevada, and the amount of forest disturbance and loss would be small relative to the total amount of those forests existing in the region. No sensitive forest types would be removed. In addition, the remaining forest lands in both parcels would be zoned TPZ, and the East Parcel's forest land would be protected in perpetuity.

Addressing the project's cumulative impacts on land use plans and forest resources, the draft EIR first stated that the context or geographic scope of its cumulative impacts analysis was the Martis Valley and the Truckee-Tahoe region of eastern Placer County. The EIR would consider impacts from the project in relation to impacts from other foreseeable development projects and regional and local land use plans that had been approved or were pending approval within the stated geographic scope. The EIR identified each of these development projects and land use plans. It concluded that, when considered with the list of projects and land use plans in the geographic area, the project as a whole would not create a cumulative impact related to conflicts with any relevant land use plans.

Despite its earlier statement, the EIR utilized a different method of analysis and geographic scope when it considered the project's cumulative impacts on forest resources. Instead of basing its analysis on comparing the project's impacts with the impacts from the listed plans and projects in the region, the EIR based its analysis on a projection of tree loss from development within the entire county. The analysis went as follows:

The County's 1994 Countywide General Plan EIR stated that in 1986, Placer County contained approximately 423,000 acres of commercial forest land. An estimated 13,600 acres (approximately three percent) of this forest land would be converted upon buildout of the general plan's land use diagram by 2010, with additional conversion expected through 2040. The general plan EIR had determined that this amount of commercial timber land conversion would be less than significant as mitigated. The draft

EIR in this case stated that forest land conversion since 1986 had occurred, and continued to occur, in accordance with the County's projections.

Using this projection, the draft EIR concluded that the project's cumulative impact on forest resources would be less than significant. The project's conversion of 651.5 acres of forest land cumulatively "would be small, less than one percent relative to the approximately 400,000 acres" of forest land presumably remaining in the County. The EIR also stated that not only would the conversion be small, it "would not cause regional forest conversion projections to be exceeded . . . ."

The EIR further stated that the affected West Parcel land consists of common forest types which are widely distributed throughout the region and the Sierra Nevada. Their conversion "would not substantially reduce the quantity or quality of common forest habitat types in the region."

In addition, when compared to the development allowed on the East Parcel under the Martis Valley Community Plan, the project would create a net gain of eight acres of land zoned TPZ, and the East Parcel would be preserved as forest land in perpetuity, connecting an estimated 50,000 acres of open space and forest lands. For these reasons, the draft EIR concluded that "cumulative conversion of forest land would be less than significant."

On October 30, 2015, less than 10 days after the County released the draft EIR for public comment, Governor Jerry Brown declared a state of emergency regarding tree mortality in state forest lands. In his proclamation, the governor stated that severe drought and resulting bark beetle infestations across broad areas had caused vast tree mortality in several regions of the state. The Forest Service estimated that over 22 million trees had died and tens of millions more were likely to die by the end of that year. The die-off would worsen wildfire risk, threaten people living in impacted areas with injury from falling trees, and worsen the threat of erosion across watersheds. The

92

governor stated, "[R]ecent scientific measurements suggest that the scale of this tree die-off is unprecedented in modern history[.]"

The Governor ordered state agencies and local governments to remove dead or dying trees from areas where they threatened power lines, infrastructure, roads, and other structures. He also ordered state agencies to monitor the tree removal efforts to assess their effectiveness "in protecting forest health and strengthening forest resilience."

Responding to the governor's proclamation, the County board of supervisors on December 8, 2015, issued its own emergency declaration. The County stated that data collected by state and federal agencies "demonstrate[d] that tree mortality has reached epidemic levels across the entire western slope of the Sierra Nevada range which includes a large portion of Placer County, and this data indicates further tree mortality increases in the very near future . . . ." County staff stated tree mortality was a "crisis in the Forest and in Wildland Urban Interface areas across the County."

The County received few comments on the draft EIR regarding the project's impacts on forest resources. One commentator, the North Tahoe Preservation Alliance, argued the draft EIR's analysis of the project's cumulative impacts on timberland conversion should contain a discussion of the cumulative loss of habitat and forest land both in the Tahoe region and in the Sierra Nevada. Responding in the final EIR, the County simply referred the organization to the draft EIR's discussion of the project's contribution to the cumulative loss of forested lands.

After the County released the final EIR in May 2016 without making changes to the draft EIR's analysis of forest land impacts, the Committee and the North Tahoe Preservation Alliance, in a jointly submitted letter, criticized the EIR's cumulative impacts analysis. They contended that the analysis's comparison of the acreage to be converted with the 400,000 acres of available forest land was not an adequate analysis; the County had to determine the cumulative impact based on the combined impact of other projects. The Committee also stated that the analysis had to include the conversion

93

of forest land resulting from climate-related influences such as drought, wildfire, and bark beetles, and that the analysis could not utilize the buildout of the East Parcel authorized under the community plan for its baseline.

Responding, the County stated the draft EIR's analysis of cumulative impacts was adequate. It said that "[e]stimating climate-related forest loss due to drought, wildfire, or bark beetle, as suggested, would be speculative." The EIR used the Countywide General Plan EIR and reasonable assumptions regarding ongoing forest conversion in the area to determine whether the project's contribution to cumulative forest conversion was significant. The County also stated it used existing physical conditions as its baseline for the analysis, but it also discussed the buildout authorized under the community plan to disclose the project's existing setting and effects.

At one of the planning commission's hearings on the project, a district ranger of the Tahoe National Forest addressed the issue of tree mortality. She said, "We have significant issues in other parts of the state where whole hillsides are red because the trees have died due to mortality related to drought and increases in bug populations. . . . We're blessed that we don't have as much of that problem here locally either at Lake Tahoe or on the Truckee side, but I believe that it's probably coming our direction. I know that the west side of the Tahoe National Forest definitely has more mortality today than they had a year ago."

B.     Discussion

The Committee contends the EIR's analysis of the project's cumulative impact on forest land conversion was not supported by substantial evidence and violated CEQA's procedural requirements for a number of reasons: (1) the 1986 baseline and setting used from the 1994 general plan EIR were outdated and inaccurate as they did not disclose the tree mortality that had occurred within the County, which was the geographical scope of the cumulative impacts analysis; (2) the cumulative impact analysis improperly focused

94

on the individual project's relative effects instead of the cumulative effect the project and other related projects will have on forest resources; (3) the EIR used an improper plan-to-plan comparison by comparing the proposed project with the development allowed on the East Parcel under the Martis Valley Community Plan; and (4) the EIR did not consider climate-driven tree mortality as one of the sources of the cumulative impact on forest resources.

### 1. Legal background

Cumulative impacts under CEQA are two or more individual environmental effects "which, when considered together, are considerable or which compound or increase other environmental impacts." (Guidelines, § 15355.) "The individual effects may be changes resulting from a single project or a number of separate projects." (*Id.*, subd. (a).)

"The cumulative impact from several projects is the change in the environment which results from the incremental impact of the project when added to other closely related past, present, and reasonably foreseeable probable future projects." (Guidelines, § 15355, subd. (b).) It is an impact "which is created as a result of the combination of the project evaluated in the EIR together with other projects causing related impacts." (Guidelines, § 15130, subd. (a)(1).) "Cumulative impacts can result from individually minor but collectively significant projects taking place over a period of time." (Guidelines, § 15355, subd. (b).)

CEQA requires an EIR to discuss cumulative impacts when two conditions are present: (1) the combined impact of the project and other projects is significant, and (2) the project's incremental contribution to the combined impact is "cumulatively considerable." (Guidelines, § 15130, subd. (a), (a)(2); *Communities for a Better Environment v. California Resources Agency* (2002) 103 Cal.App.4th 98, 120,

95

disapproved of on another ground in *Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1109, fn. 3; Kostka & Zischke, *supra*, § 13.39.)

The combined impact of the project and other projects is significant if it will cause a substantial, or potentially substantial, adverse change in the physical environment. (§§ 21100, subd. (d), 21068; Guidelines, §§ 15358, 15382.)

An individual project's contribution to a cumulative impact is "cumulatively considerable" if the project's incremental effects "are significant when viewed in connection with the effects of past projects, the effects of other current projects, and the effects of probable future projects." (Guidelines, § 15065, subd. (a)(3).) In some cases, a project-specific impact may be insignificant but its contribution to a cumulative impact may be cumulatively considerable. (See *Cleveland National Forest I, supra*, 3 Cal.5th at p. 512 [project's individual contribution to climate change may be insignificant by itself but still may be cumulatively considerable].)

CEQA requires no cumulative impact analysis in the EIR if the combined impact is not significant or the project's incremental contribution to the impact is not cumulatively considerable. (*San Francisco Baykeeper, Inc. v. State Lands Com.* (2015) 242 Cal.App.4th 202, 222; *City of Long Beach v. Los Angeles Unified School Dist.* (2009) 176 Cal.App.4th 889, 909; Kostka & Zischke, *supra*, § 13.40.) If the lead agency finds either that the combined impact is insignificant or the project's contribution is not cumulatively considerable, the EIR must briefly explain the basis for the agency's finding and, where the impact is found to be insignificant, identify facts and analysis supporting the agency's conclusion. (Guidelines, § 15130, subd. (a), (a)(2).) In making those explanations, the EIR may, but is not required to, use the Guidelines' technical requirements, discussed next, for its cumulative impacts analysis. (See *Preserve Wild Santee v. City of Santee* (2012) 210 Cal.App.4th 260, 277-278 [city did not violate CEQA by relying on regional habitat conservations plans in the EIR to determine the project's

incremental effect on a cumulative impact was not cumulatively considerable]; Kostka & Zischke, *supra*, § 13.40.)

The Guidelines provide two alternative methods for discussing significant cumulative impacts in an EIR, and at least one of them must be used. Under the first method, the EIR may evaluate cumulative impacts using a "list of past, present, and probable future projects producing related or cumulative impacts, including, if necessary, those projects outside the control of the agency[.]" (Guidelines, § 15130, subd. (b)(1)(A).) If the lead agency utilizes a list of projects, "factors to consider when determining whether to include a related project should include the nature of each environmental resource being examined, the location of the project and its type." (Guidelines, § 15130, subd. (b)(2).)

Under the second method for analyzing cumulative impacts, an agency may utilize a "summary of projections contained in an adopted local, regional or statewide plan, or related planning document, that describes or evaluates conditions contributing to the cumulative effect. Such plans may include: a general plan, regional transportation plan, or plans for the reduction of greenhouse gas emissions." (Guidelines, § 15130, subd. (b)(1)(B).)

Each of these methods has its drawbacks. "The list of projects in the analysis is often attacked as underinclusive." (Kostka & Zischke, *supra*, § 13.42.) And the projections used in the summary-of-projection method "may be inadequate if they are outdated or inaccurate." (*Id*. at § 13.43.)

Under either method, the EIR should establish the geographic scope of the area affected by the cumulative impacts. The geographic scope to be analyzed must be reasonably defined. It "cannot be so narrowly defined that it necessarily eliminates a portion of the affected environmental setting." (*Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1216.) Nor may it be defined so broadly as to dilute the significance of a project's cumulative impact. (See *Ebbetts Pass*

*Forest Watch v. Department of Forestry & Fire Protection* (2004) 123 Cal.App.4th 1331, 1352-1353 [upholding agency's determination not to use the entire Sierra Nevada range as the geographic area as a large assessment area "could serve to dilute any impacts estimated to insignificance"].)

The EIR, using either the list method or the projections method, must summarize the expected environmental effects which the projects will contribute and provide a reasonable analysis of the cumulative impacts created by the projects. (Guidelines, § 15130, subd. (b)(4)-(5).) The analysis should include "all sources of related impacts, not simply similar sources or projects. (Kostka [& Zischke], *supra,* § 13.44, p. 653.)" (*City of Long Beach v. Los Angeles Unified School Dist., supra*, 176 Cal.App.4th at p. 907.) It must also examine reasonable, feasible options for mitigating or avoiding the project's contribution to any significant cumulative impact. (Guidelines, § 15130, subd. (b)(5).)

We review an agency's methodology or criteria for assessing a cumulative impact for substantial evidence. (*South of Market Community Action Network v. City and County of San Francisco* (2019) 33 Cal.App.5th 321, 339.) Also, "[a]n agency's selection of the geographic area impacted by a proposed development . . . falls within the lead agency's discretion, based on its expertise. (Guidelines, § 15130, subd. (b)(3); *City of Long Beach v. Los Angeles Unified School Dist.*, [*supra*,] 176 Cal.App.4th [at p.] 907 [].) Moreover, discussion of cumulative impacts in an EIR ' "should be guided by the standards of practicality and reasonableness." ' (*City of Long Beach,* at p. 912.) Absent a showing of arbitrary action, a reviewing court must assume the agency has exercised its discretion appropriately. (*Id.* at p. 908.)" (*South of Market Community Action Network v. City and County of San Francisco, supra*, 33 Cal.App.5th at p. 338.)

## 2. Sufficiency of the EIR's analysis

The County concluded in the EIR that the cumulative conversion of forest land was less than significant. The County in 1994 had determined that the loss of 13,600 acres of commercial forest land within the County's boundaries due to planned development from 1986 through 2010, with additional conversion expected through 2040, was not a significant cumulative effect. Forest land conversion for development since 1994 had occurred, and continued to occur, in accordance with the County's projections. The EIR stated the project's conversion of 651.5 acres would not cause the regional conversion projection to be exceeded.

The Committee contends the County's use of the 1986 baseline and setting was improper as those numbers were outdated. The EIR defined the geographic scope of its cumulative impact analysis as the entire County, but it did not disclose the tree mortality that had occurred in the County since 1986 or since the drought began in 2011 and that likely existed when the County issued its notices of preparation in 2014 and 2015.

The declarations by the governor and the County may in fact indicate that the 1994 projection is outdated and that, contrary to the EIR's assertion, fewer than 400,000 acres of commercial forest land existed at the time the County issued its notice of preparation due to tree mortality. Generally, an EIR must describe physical environmental conditions as they exist at the time the notice of preparation is published. (Guidelines, § 15125, subd. (a)(1).)

In the final EIR, however, the County stated that, "[e]stimating climate-related forest loss due to drought, wildfire, or bark beetle, as suggested, would be speculative." As we stated earlier, CEQA does not require a lead agency to speculate. It requires a lead agency to describe settings and impacts "in the light of what is reasonably feasible" and with "a good faith effort at full disclosure." (Guidelines, § 15151.) An EIR's discussion of cumulative impacts "need not provide as great detail as is provided for the effects

attributable to the project alone. The discussion should be guided by the standards of practicality and reasonableness . . . ." (Guidelines, § 15130, subd. (b).)

Because the County could not reasonably determine the extent of tree mortality within its borders caused by drought and infestation, it acted within its discretion to rely on the General Plan's projection and the historical compliance with that projection when to assess the project's cumulative impact.

The Committee contends the EIR improperly analyzed the project's cumulative impact by relying on the project's relative impact instead of its contribution to the cumulative impact by it and other projects. We agree that the EIR's statement that the project's conversion would be "small and less than one percent relative to the 400,000 acres" of remaining commercial forest land does not meet CEQA's procedural requirement for analyzing cumulative impacts. Focusing on an individual project's relative effect does not indicate whether the project's contribution to the cumulative impact will be cumulatively considerable in light of its and other projects' contributions to the impact. It simply describes the project's individual impact on existing forest resources. (See *Kings County Farm Bureau v. City of Hanford, supra*, 221 Cal.App.3d at p. 718 [regarding greenhouse gas emissions, "[t]he relevant question to be addressed in the EIR is not the relative amount of precursors emitted by the project when compared with preexisting emissions, but whether any additional amount of precursor emissions should be considered significant in light of the serious nature of the ozone problems in this air basin"].)

However, the EIR also determined the cumulative impact was not significant because it was within the projection of converted forest land which the County had previously determined would not constitute a significant cumulative impact. This was an appropriate analysis of cumulative impacts. As mentioned above, the Guidelines authorize a lead agency to utilize a summary of projections contained in a general plan or

100

related planning document that evaluates conditions contributing to the cumulative impact. (Guidelines, § 15130, subd. (b)(1)(B).)

The Committee asserts that the EIR used an improper plan-to-plan comparison as part of analyzing cumulative impacts by comparing the project with the development presently allowed on the East Parcel under the Martis Valley Community Plan. (See *Environmental Planning and Information Council v. County of El Dorado* (1982) 131 Cal.App.3d 350, 352.) This argument has no merit. The plan-to-plan comparisons were condemned by courts where the thrust of an EIR's analysis consisted only of comparing the proposed project with proposed development allowed under an existing plan instead of comparing the project to the existing physical environment. (*Ibid*.; see *St. Vincent's School for Boys, Catholic Charities CYO v. City of San Rafael* (2008) 161 Cal.App.4th 989, 1005 ["an EIR is required to assess the impact of amendments to the general plan against existing conditions on the ground, not against the impact of the amendments on the previous version of the general plan"].)

"Where a proposed project is compared with an adopted plan, the analysis shall examine the existing physical conditions . . . ." (Guidelines, § 15125, subd. (e).) This is what occurred here. The EIR analyzed the project's impacts on the existing forestland as expressed through the general plan's projection in addition to comparing them with the development authorized under the existing community plan. That the EIR showed the project's contribution to the cumulative impact would be less than that allowed under the existing community plan did not violate CEQA where the EIR also analyzed the project's impacts on the physical environment.

Finally, the Committee contends that the cumulative impacts analysis violated CEQA because the EIR did not consider climate-driven tree mortality as one of the sources of forest conversion in the County. The County responds that CEQA defines a cumulative impact as an impact resulting from the combination of the proposed project

"with other projects causing related impacts."  (Guidelines, § 15130, subd. (a)(1).)  Tree mortality is not a separate "project" that can be reviewed as a source.

This argument highlights the difficulty under CEQA of reviewing and accounting for physical impacts that result from climate change.  Evidence in the record indicates that climate change is one of the likely causes of tree mortality in the state.  But climate change in its nature and global scope is fundamentally different from other types of cumulative impacts reviewed under CEQA, and CEQA in its language and structure does not lend itself well to evaluating impacts caused by something other than a physical project.  (*Cleveland National Forest I, supra*, 3 Cal.5th at p. 512; Kostka & Zischke, *supra*, § 20.81.)

The Committee argues that "[e]nvironmental analysis cannot operate under the assumption that climate change and its impacts are not the result of human activity or a 'project.' "  The Legislature agreed with the Committee's point.  It recognized that greenhouse gas emissions "and the effects" of greenhouse gas emissions were appropriate subjects for CEQA analysis.  At the Legislature's direction, the Resources Agency amended the Guidelines to provide for analysis and mitigation of a project's potential cumulative impact on global warming by reviewing a project's emission of greenhouse gases.  (Guidelines, § 15064.4.)

As described above, the EIR quantified the project's estimated greenhouse gas emissions in both its construction and operation phases.  It determined that greenhouse gas emissions during construction would be less than significant, but cumulative operational emissions would be potentially significant and unavoidable.  It called for mitigation.  In this manner, the EIR addressed the project's contribution to climate change's adverse impact on forest resources.  This is where CEQA required that analysis to occur.  The County did not abuse its discretion by not also including that analysis in its discussion of the project's impacts on forest resources.

Other than attacking the efficacy of the proposed mitigation measure for greenhouse gas emission impacts discussed above, the Committee does not challenge the sufficiency of the EIR's analysis of, or its compliance with CEQA in analyzing, the project's contribution to climate change. We thus conclude the EIR's analysis of the project's cumulative impacts on forest resources, when considered with the analysis of the project's greenhouse gas emissions, complies with CEQA's procedures and is supported by substantial evidence.

II

*Mitigation of Traffic Impacts to State Route 267*

The County found that it did not identify any feasible mitigation measures that would reduce the project's significant and unavoidable impact to traffic congestion on state route 267 except payment of a traffic impact fee that would fund capital improvements to the highway. The Committee contends substantial evidence does not support this finding as the County, in violation of CEQA, did not review a number of suggested transportation demand management measures in the EIR that could feasibly mitigate the impact by reducing the project's future occupants' demand for automobile use. We agree with the Committee.

A. <u>Background</u>

The EIR determined that the project's impacts to traffic along state route 267 would be significant. Segments of the highway, including the segment that ran from the project's proposed entrance to Kings Beach, were already operating at an unacceptable level of service during seasonal peak hours, and the project would worsen congestion on those segments and worsen other segments to unacceptable levels.

To mitigate these impacts, the draft EIR proposed mitigation measure 10-2, which would require the applicants to pay the County's traffic impact fee. The impact fee funds the County's capital improvement program. The improvement program called for

103

making a number of improvements to route 267: widening the road to four lanes from the Placer County line near Truckee south to Brockway Summit just past the project's proposed entrance, making intersection improvements and adding left-turn and acceleration lanes along the route. It also called for purchasing two transit vehicles and developing intelligent transportation systems. The improvement program estimated these improvements would cost approximately $36.8 million. The draft EIR indicated the project's fair-share of this cost, payable via the traffic impact fee, would be $3,685,511.42. These improvements would result in acceptable levels of service on route 267 from the County line to the project's access roadway.

The capital improvement program, however, did not include widening route 267 from Brockway Summit to state route 28 in Kings Beach. The EIR stated that as a result, there was no feasible mitigation for the project's significant impact to that segment of the highway. For that reason, and because it was not feasible for the project itself to fund the planned widening of route 267's other segments and it was unlikely that those improvements would be constructed before the project was implemented, the EIR concluded the project's impacts to route 267 were significant and unavoidable.

The draft EIR also found that the project could significantly impact existing transit service. The project included constructing a transit shelter along route 267, and the additional ridership generated by the project could increase demand above the local transit system's capacity. To mitigate this potential impact, the EIR proposed mitigation measures 10-5a and 10-5b. Measure 10-5a required the applicants to establish a new zone of benefit within an existing County service area or annex the project into a pre-existing zone of benefit "to provide adequate funding of capital and ongoing operational transit services/requirements." The applicants must submit an engineer's report supporting the level of assessments necessary to establish the zone of benefit and the basis for the special benefit appurtenant to the project.

Measure 10-5b required the commercial and homeowner associations that would be organized in the development to join the Truckee North Tahoe Transportation Management Association. A transportation management association exists to improve the general traffic and transportation conditions in the area and to address situations associated with traffic congestion and transportation systems. Joining and maintaining membership will be at a rate based on the engineer's report to be prepared for measure 10-5a. The draft EIR concluded that implementation of these two measures would offset the project's demand for additional transit services and reduce the impact to less than significant.

Commenters criticized the draft EIR's mitigation of the project's traffic impacts. The commenters generally accused the County of concluding that the impacts to route 267 were significant and unavoidable without considering feasible transportation demand management measures that could mitigate the impact without necessarily having to widen the highway. Transportation demand management measures seek to mitigate transportation impacts as well as greenhouse gas emission impacts by incentivizing people to use transit or other means of transportation to reduce the demand for automobile travel and roadway capacity. The commenters requested that the County consider requiring the developer to implement demand measures separately or as part of a plan to mitigate the project's significant and unavoidable traffic on route 267.

TRPA's comment on the draft EIR is representative. It stated the County could consider mitigating the project's increase of vehicle trips into the Tahoe Basin by allocating more of its revenues from the traffic impact fee to improvements in transit service to replace vehicle trips, such as acquiring buses, instead of improving route 267's level of service by widening it. The County could also consider establishing ongoing funding streams in amounts necessary to expand transit service to offset increased vehicle traffic. Equally important was assuring that residents and visitors were informed of and incentivized to use the expanded transit so that the investment in it resulted in actually

reducing the number of vehicle trips. Such incentives could include free transit fares, an origin-based parking charge for visitors who bring their cars, or destination-based parking charges within the Basin.

Other commenters proposed similar measures to mitigate the traffic impact on route 267, such as providing free or subsidized transit or transit passes for project residents, guests, and employees; providing a shuttle service to key destinations in the region including the North Shore and the Amtrak station in Truckee; installing signage that encouraged transit use; funding increased transit and transit stop upgrades; implementing marketing and information campaigns regarding transit options; imposing parking charges; and providing a covered bicycle area near commercial establishments. Some of these types of measures were developed by the Placer County Air Pollution Control District and others to mitigate air pollution impacts addressed in the EIR for the nearby development at issue in *Squaw Valley*.

Commenters also criticized transit mitigation measures 10-5a and 10-5b. They argued that both measures were inadequate as the EIR did not show that the fees to be paid under them were part of an adopted plan which the County was committed to enforce. Critiquing the measures individually, commenters argued that measure 10-5a regarding joining or establishing a zone of benefit to fund transit was inadequate because it did not describe the benefit zones it proposed or identify the level of assessments necessary to establish such an entity. It also did not explain how the zone would actually reduce the project's impacts on transit.

The commenters argued that measure 10-5b, requiring membership in the transportation management association, suffered from similar flaws. The draft EIR did not identify the amount the project would have to contribute to the association or how the association would ensure that the project's impacts on public transit would be mitigated.

The County responded to the suggested mitigation measures and comments in the final EIR. It stated that the specific plan itself included some of the requested

transportation demand measures. The plan required the homeowners' association to provide a community shuttle to transport residents and guests to onsite amenities and to Northstar. The shuttle could potentially travel to the Tahoe Basin. It also could be coordinated with other shuttle and transit services in the vicinity. In addition, the project would develop an extensive network of on-site walking, biking, and hiking trails.

The specific plan also addressed transit. It called for constructing a covered bus shelter/transit stop to accommodate transit vehicles traveling on state route 267. A plan policy called for the project to join or partner with local transit organizations and transit providers to extend service to the project site and encourage the use of regional transit services.

The final EIR stated that the project's payment of the traffic impact fee under mitigation measure 10-2, creation of and funding from the benefit district assessment under measure 10-5a, and its membership in the transportation management association under measure 10-5b would help fund transit and transit improvements such as some of those the commenters had sought. The traffic impact fee, in addition to funding improvements to route 267, would help fund the purchase of two transit vehicles, transit improvements in Tahoe City, transit shelters at various locations, compressed natural gas upgrades for the regional transit provider, Tahoe Area Regional Transit (TART), and bike lanes along route 28 in Kings Beach.

Measure 10-5a would fund increased transit service along the route 267 corridor. The EIR stated the specific level of transit improvements that the new benefit zone would fund had yet to be defined, but at a minimum, it would likely increase peak commute-period transit service along route 267 between Kings Beach and Truckee, which is when the highest passenger loads occur. The County was in the process of updating the TART Systems Plan for the regional transit provider. This plan would result in more comprehensive service in the resort areas between Truckee and the North Shore, including year-round nighttime service. The new benefit zone would provide funding for

these enhanced services.  Before the zone would be implemented, the County would define the specific transit operations and capital improvements to be funded to ensure adequate transit capacity is provided.  The engineer's report for the zone would include the overall demand for transit generated by the project's subsequent phases and what elements of the development would drive that demand.

We note that the County approved the updated TART Systems Plan in April 2016, shortly before it released the final EIR.  Under the updated plan, TART would increase service frequency (including on route 267), increase night hours, and implement free service for all riders.  The plan estimates the costs of these improvements.  Funding sources include expanded County service area zones of benefit in new development and contributions from developers.

Back to the final EIR, as for mitigation measure 10-5b, the County stated that requiring membership in the transportation management association was a standard mitigation measure for large development projects in Eastern Placer County.  It was intended to ensure ongoing participation by major economic institutions in regional transit and transportation discussions and to improve transit service.  By joining, the project would provide funding that would be used toward enhanced transit and other forms of multimodal transportation through the association's work in fostering partnerships, resources, and advocacy and in promoting transit and traffic solutions.  The project's membership would no longer be based on the engineering report for the transit zone of benefit.  Instead, it would be defined by the transportation management association and be tied to improvements to be funded.

The final EIR acknowledged that commenters had suggested mitigation measures such as transit subsidies or free transit for project residents, transit stop upgrades, shuttle service to key destinations in the region, recruiting transit riders through marketing, and covered bicycle parking at commercial destinations.  But it stated that with the updated TART Systems Plan and implementation of mitigation measures 10-2, 10-5a, and 10-5b,

"no additional measures are necessary." The project already included a shuttle service that could be coordinated with other transit services. Recruitment of transit riders would likely occur, or more effectively occur, through efforts already in place by the transportation management association to publicize transit opportunities. Providing covered bicycle parking at the site's commercial uses would not mitigate the project's external impacts.

Regarding the other suggested measures modified from the *Squaw Valley* EIR, the County stated they were not transferable to the project because of the different natures of the two projects. The current project would result in residential units for sale and neighborhood commercial uses. It was not a resort that would be controlled by the project applicant following construction and that would allow for implementing measures such as discounted transportation or transit passes.

In addition to responding to comments, the County in the final EIR revised its analysis of the project's impact on transit. In the draft EIR, the County had determined that ridership on the current bus service along route 267 was at capacity during peak winter hours and that the project with its new bus stop would cause existing capacity to be exceeded. In the final EIR, the County determined that bus ridership on route 267 was actually below capacity during the winter peak hours and that the project would not cause existing capacity to be exceeded. Under this revised analysis, the potential impact to transit was less than significant. Nonetheless, the final EIR continued to propose mitigation measures 10-5a and 10-5b. Complying with them would ensure the impact on transit remained less than significant.

After the final EIR was released, the Committee recommended that the County mitigate the project's transportation and greenhouse gas emission impacts by requiring the project to prepare a transportation demand management program to reduce expected peak motor vehicle trips. It also recommended that the County require the project to contribute funding to bike facility projects in order to increase bicycle usage and offset

the project's impacts.  Responding, the County directed the Committee to see its previous responses to similar comments in the final EIR.

When it approved the project, the board of supervisors imposed mitigation measure 10-2 to mitigate the project's traffic impact to route 267, and it found that no additional feasible mitigation measures were identified to address that significant and unavoidable impact.  The board also imposed mitigation measures 10-5a and 10-5b even though CEQA does not require a lead agency to mitigate impacts which the agency determined were less than significant.

B.     Discussion

The Committee contends insufficient evidence supports the County's finding that no additional feasible mitigation measures were available to mitigate impacts to route 267.  The traffic demand management measures it and others proposed, including improvements to regional cycling infrastructure, were facially feasible mitigation measures, and the County violated CEQA by not discussing them in the EIR.  Instead of discussing the requested measures in the final EIR, the County merely repeated project policies and the mitigation measures the draft EIR set forth and declared that no additional mitigation measures were needed.  The Committee claims that these responses did not take the place of discussing other feasible mitigation measures.  Policies that are part of the plan under review are not mitigation measures.

The Committee also claims that mitigation measures 10-5a and 10-5b were not valid mitigation measures because they were not part of an adopted and enforceable plan, they lacked sufficient detail, and they were rendered inoperative when the County ultimately concluded the project would not cause a significant impact on transit.

The County asks us to review the adequacy of the mitigation measures that were adopted.  It contends the features already incorporated into the plan and the payments required under mitigation measures 10-2, 10-5a and 10-5b show that the County required

110

the project to do "more than its fair share" to support transit. The County did not ignore the proposed mitigation measures; it responded to the commenters by describing the transit mitigation already incorporated into the project.

The County misstates the issue before us. The issue is not whether the County required the project to do more than its fair share to support transit or that no additional mitigation measures were necessary. The issue is whether substantial evidence supports the EIR's conclusion and the County's finding that other than payment of the traffic impact fee, no feasible mitigation measures were identified to reduce the project's significant impacts on route 267 traffic. (See *Citizens for Open Gov. v. City of Lodi* (2012) 205 Cal.App.4th 296, 323 [finding of no feasible mitigation measures reviewed for substantial evidence].) We conclude the finding is not supported by substantial evidence.

Under CEQA, "public agencies should not approve projects as proposed if there are feasible alternatives or feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects . . . ." (§ 21002.) CEQA procedures "are intended to assist public agencies in systematically identifying both the significant effects of proposed projects and the feasible alternatives or feasible mitigation measures which will avoid or substantially lessen such significant effects." (*Ibid.*)

CEQA requires an EIR to include a detailed statement of feasible mitigation measures proposed to minimize significant effects on the environment. (§ 21100; Guidelines, § 15126.4, subd. (a)(1).) A description of feasible mitigation measures is part of "the core" of an EIR. (*Citizens of Goleta Valley v. Board of Supervisors, supra*, 52 Cal.3d. at p. 564.)

An EIR's discussion must "identify mitigation measures for each significant environmental effect identified in the EIR." (Guidelines, § 15126.4, subd. (a)(1)(A).) The discussion must distinguish between measures proposed by project proponents to be

111

included in the project and measures proposed by the lead agency or other persons. (*Ibid*.)

Where several mitigation measures are available to mitigate an impact, "*each should be discussed* and the basis for selecting a particular measure should be identified." (Guidelines, § 15126.4, subd. (a)(1)(B), italics added.) "[A]n EIR need not analyze ' " 'every *imaginable* alternative or mitigation measure; its concern is with *feasible* means of reducing environmental effects.' " ' (*Concerned Citizens of South Central L.A. v. Los Angeles Unified School Dist.* (1994) 24 Cal.App.4th 826, 841, [original italics].) Under the CEQA statute and guidelines a mitigation measure is 'feasible' if it is 'capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors.' (§ 21061.1; and see Guidelines, § 15364.)

"In keeping with the statute and guidelines, an adequate EIR must respond to specific suggestions for mitigating a significant environmental impact unless the suggested mitigation is facially infeasible. (*San Francisco Ecology Center v. City and County of San Francisco* (1975) 48 Cal.App.3d 584, 596; *Concerned Citizens of South Central L.A. v. Los Angeles Unified School Dist., supra*, 24 Cal.App.4th at pp. 841-842.) While the response need not be exhaustive, it should evince good faith and a reasoned analysis. (*San Francisco Ecology Center* [*v. City and County of San Francisco (1975)*] 48 Cal.App.3d [584,] 596; Guidelines § 15088, subd. (b).)" (*Los Angeles Unified School Dist. v. City of Los Angeles* (1997) 58 Cal.App.4th 1019, 1029.) "Conclusory statements unsupported by factual information will not suffice." (Guidelines, § 15088, subd. (c).)

This is not to imply that the County must find the suggested measures are feasible measures. "This is not our call. Our role is merely to determine whether the EIR provides the [County] sufficient information on which to base its judgment whether to approve the plan." (*Los Angeles Unified School Dist. v. City of Los Angeles, supra*, 58 Cal.App.4th at p. 1030.)

112

The commenters asked for the EIR to discuss whether the project could fund expanding and incentivizing use of the transit system not only to address the project's impact on that system, but also to address the project's impact on route 267. They asked for the EIR to discuss whether the increased vehicle traffic on route 267 could be mitigated not just by expanding part of the highway, but instead by expanding and incentivizing transit services to reduce the amount of traffic the project will generate on route 267. Because the project would significantly impact route 267, CEQA required the EIR to discuss the commenters' suggestions in good faith and with a reasoned analysis if they were facially feasible, a point the County does not contest.

Although the final EIR addressed a number of the proposed individual transportation demand measures, it did so in the context of mitigating the project's demand for transit. Even the funding to be provided under the new zone of benefit required by mitigation measure 10-5a for transit measures, which the County states will provide some of the demand measures the commenters seek, will be based on the project's demand for transit. But the suggested mitigation was to look beyond the project's impact on the existing transit system and consider whether expanding the transit system and adopting transportation demand management measures in lieu of widening route 267 could reduce the project's impact on the highway. For example, TRPA suggested the County consider reallocating the traffic impact fee's proceeds so that more went to improving transit service and less went to widening route 267. Another commenter asked the County to consider a package of transportation demand management measures to mitigate traffic impacts on route 267. The EIR did not address the suggested approach.

This approach may be somewhat unique, but in *City of Hayward v. Trustees of California State University* (2015) 242 Cal.App.4th 833, the court of appeal concluded that a university's commitment to adopt a transportation demand management plan was a feasible measure to mitigate the impact that the university's planned expansion would

113

have on traffic and parking where the campus lacked convenient access. (*Id*. at pp. 851-855.) In other words, instead of building more roads to accommodate the increased traffic the project would generate, the university sought to mitigate its traffic impacts through a transportation demand management plan.

The court of appeal held the mitigation measure satisfied CEQA. Substantial evidence indicated the management measures would increase transit ridership and reduce individual vehicle use and parking, and the university had committed to develop and implement the plan. (*City of Hayward v. Trustees of California State University, supra,* 242 Cal.App.4th at pp. 854-855.) Its deferral of selecting any particular demand measure did not violate CEQA where the plan set out quantitative criteria and specific deadlines for completion of its component parts. (*Id*. at p. 855.)

In its brief, the County states it "neither rejected nor ignored transit mitigation. Quite the contrary, the County required the Project to do more than its fair share to support transit." In a sense, the County did just that. It imposed measures to mitigate the project's demand on transit even though it found the project would not significantly impact transit. The County stated it imposed the measures to ensure the project's impact on transit remained less than significant. The applicants have not challenged the County's action. But again, the EIR considered the measures in response to the project's impact on transit, not as an alternative means to mitigate the project's impact on route 267 traffic.

The County claims the Committee dismisses the transit measures the project will implement "and seemingly believes that the Project must solve the region's transit shortfall." Of course, a mitigation measure cannot violate state or federal constitutional limitations. "Under *Nollan* [*v. California Coastal Com.* (1987) 483 U.S. 825 [97 L.Ed.2d 677]] and *Dolan* [*v. City of Tigard* (1994) 512 U.S. 374 [129 L.Ed.2d 304]] the government may choose whether and how a permit applicant is required to mitigate the impacts of a proposed development, but it may not leverage its legitimate interest in

114

mitigation to pursue governmental ends that lack an essential nexus and rough proportionality to those impacts." (*Koontz v. St. Johns River Water Management Dist.* (2013) 570 U.S. 595, 606 [186 L.Ed.2d 697].) Review of the suggested mitigation measures must not ignore constitutional limitations. TRPA's comment perhaps implicitly recognized the possible application of these limitations when it asked for the County to consider increasing the traffic impact fee's contribution to transportation demand management measures in exchange for reducing the fee's contribution to widening route 267.

The commenters, however, had nonetheless requested that the EIR discuss transportation demand management plans and measures to reduce traffic impacts in addition to reducing impacts on the transit system. The County does not claim that the suggested measures were infeasible, but the EIR did not consider them as a means to mitigate impacts on route 267. As a result, substantial evidence does not support the County's finding that no additional feasible mitigation measures were identified to mitigate the project's impact on route 267. The omission of this required analysis is prejudicial error.

Because we conclude the EIR's discussion of mitigation measures for traffic impacts did not comply with CEQA, we do not address the Committee's other arguments which make the same point.

III

*Effects of Paying the Traffic Impact Fee*

If a mitigation measure will cause one or more significant environmental effects in addition to those that the proposed project will cause, CEQA requires an EIR to discuss the measure's effects but in less detail than the project's significant effects. (Guidelines, § 15126.4, subd. (a)(1)(D).) The Committee claims the EIR violated CEQA by not

115

discussing the environmental impacts of widening state route 267 which the project's payment of the traffic impact fee would help fund. We find no prejudicial error.

The final EIR stated the County had approved the widening as a matter of policy when it approved the Martis Valley Community Plan, and the community plan EIR had addressed the impacts of widening the highway at a program level. The final EIR stated that in the future, if Caltrans moves forward with a project to widen the highway, "the project would be subject to a separate environmental study to analyze and disclose the impacts of widening the highway."

The Martis Valley Community Plan, adopted in 2003, recognized that the traffic it projected at full buildout would require route 267 to be widened to four lanes. The plan's EIR required the County to establish the capital improvement program to fund a list of road and intersection improvements, including widening route 267. The plan's EIR noted that since these improvements had yet to be designed, it was not possible to determine the extent of their environmental effects. However, the improvements could result in temporary surface water quality, air quality, and noise impacts associated with construction; operational noise and air quality impacts; biological resource impacts associated with construction; and cultural resource impacts.

No evidence in the record indicates that circumstances had changed since the County released the community plan EIR. As of 2012, Caltrans continued to plan for widening route 267 to four lanes, but nothing indicates it had proceeded with designing and implementing the improvement. The widening project will undergo CEQA review when it is designed, but until then, the EIR before us could add nothing more about the widening's impacts than what had already been said. The EIR's reference to the community plan EIR was thus sufficient to meet the requirement of discussing the environmental impacts of the mitigation measure.

The Committee contends the analysis did not comply with CEQA because, where an EIR tiers off another EIR, CEQA requires the later EIR to state where a copy of the

prior EIR may be examined and to state that the tiering concept is being used. (Guidelines, § 15152, subd. (g).) Incorporation by reference requires similar procedures. (Guidelines, § 15150.) We agree that the EIR did not comply with these procedures but conclude that any error was not prejudicial. The widening project has been planned for many years, the public and decisionmakers have known of its likely environmental impacts to the extent they could be addressed during that time, no circumstances have changed since the County reviewed the widening's environmental impacts, the EIR referenced the prior environmental review, that information was publicly available, and the widening will undergo full CEQA review once Caltrans proceeds with the project.

"[I]n reviewing an EIR's discussion, we do not require technical perfection or scientific certainty: ' " '[T]he courts have looked not for an exhaustive analysis but for adequacy, completeness and a good-faith effort at full disclosure.' " ' [Citations.]" (*County of Fresno, supra*, 6 Cal.5th at p. 515.) "Insubstantial or merely technical omissions are not grounds for relief." (*Neighbors for Smart Rail v. Exposition Metro Line Construction Authority, supra*, 57 Cal.4th at p. 463.)

IV

*Energy Consumption*

The Committee contends the EIR did not comply with CEQA because, in the EIR's analysis of the project's energy consumption, it "did not identify or discuss impacts on renewable energy content as an element of the energy conservation analysis." Despite being requested to address renewable energy, the County in the final EIR "did not discuss either decreasing reliance on fossil fuels or increasing reliance on renewable energy resources."

While the phrase "impacts on renewable energy content" is confusing, the Committee is arguing that an EIR's analysis of a project's impacts on energy resources must include a discussion of whether the project could increase its reliance on renewable

117

energy sources to meet its energy demand as part of determining whether the project's energy impacts are significant.

A panel of this court agreed with the Committee's contention in *California Clean Energy Com. v. City of Woodland* (2014) 225 Cal.App.4th 173, 209, 213 (*City of Woodland*), and we agree with it again here.

A.    Background

In the draft EIR, the County established a standard for determining the significance of the project's impact on energy consumption. It stated that the project's impact would be potentially significant if it would result in inefficient and wasteful consumption of energy during construction or operations or require new or expanded energy facilities that could cause significant environmental effects. Applying this standard, the County concluded the project's energy impacts would be less than significant.

The project would result in increased demand for electricity and natural gas, but the electric and gas utilities indicated they were able to adequately serve the project at buildout. Liberty Utilities, the electricity provider, secures approximately 20 percent of its energy from renewable sources.

The energy to be used for construction would be nonrecoverable, but its consumption would be typical of that associated with residential and commercial construction projects in a mountainous area. Nonrenewable energy would not be consumed in a wasteful, inefficient, or unnecessary manner when compared to other construction sites in the region.

Operation of the project would be typical of residential and commercial uses. The project would be required to meet state building efficiency standards codified in Title 24 of the Code of Regulations. These regulations apply to new construction of residential and commercial buildings and regulate energy consumed for heating, cooling, ventilation,

water heating, and lighting. This would result in the project's residences requiring approximately 25 percent less energy, and nonresidential buildings requiring 30 percent less energy, than buildings constructed before 2008.

Energy-saving features would also be incorporated into the development under the plan's polices, development standards, and design guidelines. These would encourage development to exceed Title 24 energy efficiency requirements by 15 percent and to design and site buildings to reduce building energy requirements, including a reduction in energy demand associated with mechanical heating, cooling, and ventilation. Also, the plan's transportation management component would reduce potential vehicle trips by residents.

The draft EIR concluded that taken together, these policies would reduce per-capita energy use and would encourage use of renewable energy sources and alternatives to travel by personal vehicle. By implementing them, the project would not result in an inefficient or wasteful consumption of energy, and the impact would be less than significant.

During the comment period, one commenter (NTPA) asked the County to evaluate options for putting the entire project on 100 percent renewable electrical energy or some lesser percentage as may be feasible. It also asked the County to evaluate strategies for reducing reliance on fossil fuels, increasing reliance on renewable resources, reducing peak loads, and reducing the impacts of relying on remote generation facilities.

The County responded in the final EIR that the project was found not to result in inefficient or wasteful consumption of energy. The impact was thus determined to be less than significant, and no additional measures were required. Plan policies would encourage use of renewable energy sources and alternatives to travel by personal vehicle.

After the final EIR was released, the Committee and NTPA submitted additional comments and a study which the Committee claims indicates that requiring rooftop solar would be an economic investment for all dwellings in the project. The Committee also

119

asserts the study demonstrated that the project would have a potentially significant adverse impact on energy conservation "because it relies on using fossil fuels when renewable energy is economic."

B.      Discussion

CEQA requires an EIR to analyze a project's energy consumption.  (§ 21100, subd. (b)(3); Guidelines, § 15126.4, subd. (a)(1), Appendix F.)  "If analysis of the project's energy use reveals that the project may result in significant environmental effects due to wasteful, inefficient, or unnecessary use of energy, or wasteful use of energy resources, the EIR shall mitigate that energy use."  (Guidelines, § 15126.2, subd. (b).)

An EIR's analysis of a project's energy use "should include the project's energy use for all project phases and components, including transportation-related energy, during construction and operation.  In addition to building code compliance, other relevant considerations may include, among others, the project's size, location, orientation, equipment use and *any renewable energy features that could be incorporated into the project. . . .*  This analysis is subject to the rule of reason and shall focus on energy use that is caused by the project."  (Guidelines, § 15126.2, subd. (b), italics added.)

Appendix F to the Guidelines provides "[g]uidance on information that may be included" in an analysis of a project's energy use.  (Guidelines, § 15126.2, subd. (b).)  It states, "The goal of conserving energy implies the wise and efficient use of energy.  The means of achieving this goal include:  [¶]  (1) decreasing overall per capita energy consumption, [¶]  (2) decreasing reliance on fossil fuels such as coal, natural gas and oil, and [¶]  (3) increasing reliance on renewable energy sources."  (Guidelines, Appendix F, I.)

"Potentially significant energy implications of a project shall be considered in an EIR to the extent relevant and applicable to the project."  (Guidelines, Appendix F, II.)

120

Appendix F lists possible energy impacts and mitigation measures for the lead agency to consider. Possible energy impacts could arise from such things as the project's energy requirements and its energy use efficiencies; the project's effects on local and regional energy supplies, requirements for additional capacity, and peak and base period demands for electricity and other forms of energy; the degree to which the project complies with existing energy standards; the project's effects on energy resources; and the project's projected transportation energy use requirements and its overall use of efficient transportation alternatives. (Guidelines, Appendix F, II. C.)

If the project's energy impacts are significant, Appendix F suggests types of mitigation measures which a lead agency could consider. They include, among others, "measures to reduce wasteful, inefficient and unnecessary consumption of energy during construction, operation, maintenance and/or removal[;]" and, of relevance here, "[a]lternate fuels (particularly renewable ones) or energy systems." (Guidelines, Appendix F, II. D.)

Guidelines section 15126.2, subdivision (b), and Appendix F to the Guidelines thus indicate an EIR should address the project's potential to increase its use of renewable energy sources for at least two purposes. First, when the EIR analyzes the project's energy use to determine if it creates significant effects, it should discuss whether any renewable energy features could be incorporated into the project. (Guidelines, § 15126.2, subdivision (b).) The EIR's determination of whether the potential impact is significant is to be based on this discussion. Second, if the EIR concludes the project's impact on energy resources is significant, it should consider mitigating the impact by requiring uses of alternate fuels, particularly renewable ones, if applicable. (Guidelines, Appendix F., II. D. 4.)

In *City of Woodland*, this court determined that an EIR's discussion of a large retail project's impacts on energy resources did not comply with CEQA where it omitted an analysis of renewable energy options that might have been available or appropriate for

121

the project.  (*City of Woodland, supra*, 225 Cal.App.4th at p. 213.)  We reached this conclusion even though the EIR had determined the project's impacts on energy resources would be less than significant.  (*Id*. at p. 208.)

The County claims *City of Woodland* does not apply here.  It claims in that case, we concluded the city had a "further" obligation to investigate renewable energy options because the project's energy use was "potentially significant."  Not quite.  We concluded that a discussion of renewable energy options was "a potentially significant environmental consideration" under the Guidelines, the omission of which violated CEQA.  (*City of Woodland, supra*, 225 Cal.App.4th at p. 213.)

Because the EIR did not address whether any renewable energy features could be incorporated into the project as part of determining whether the project's impacts on energy resources were significant, it did not comply with CEQA's procedural requirements, a prejudicial error.

DISPOSITION

In C087102, the judgment's conclusions that the EIR's analysis of the project's impacts on Lake Tahoe's water quality and that greenhouse gas emission mitigation measure 12-2 comply with CEQA, and that substantial evidence does not support the EIR's analysis of the project's impact on evacuation plans are reversed.  The judgment is affirmed in all other respects.

In C087117, the judgment's conclusions that greenhouse gas emission mitigation measure 12-2 complies with CEQA, that substantial evidence supports the County's finding there were no additional feasible mitigation measures to mitigate the project's traffic impacts, and that the EIR's discussion of the project's energy impacts complied with CEQA are reversed.  The judgment is affirmed in all other respects.

122

The matter is remanded for further proceedings.  The parties shall bear their own costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(3).)


_____
HULL, J.



We concur:



_____
RAYE, P. J.



_____
DUARTE, J.